*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 06a0075p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

GLENN A. MORTENSEN,

               *Petitioner-Appellant,*

    *v.*

COMMISSIONER OF INTERNAL REVENUE,

               *Respondent-Appellee.*

No. 05-1344

---

On Appeal from the United States Tax Court.
No. 25991-96—Stanley J. Goldberg, Tax Court Judge.

Argued: February 3, 2006

Decided and Filed: February 28, 2006

Before: MERRITT, MARTIN, and GILMAN, Circuit Judges.

---

## COUNSEL

**ARGUED:** Terri A. Merriam, PEARSON-MERRIAM, Seattle, Washington, for Appellant. Annette Wietecha, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Terri A. Merriam, Wendy S. Pearson, PEARSON-MERRIAM, Seattle, Washington, for Appellant. Annette Wietecha, Richard Farber, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

---

## OPINION

---

BOYCE F. MARTIN, JR., Circuit Judge. This is an appeal from the United States Tax Court's decision upholding the Commissioner's determination that Mr. Mortensen is liable for a section 6662(a) negligence penalty of $784 for the taxable year 1991. The penalty stems from Mortensen's deductions on his tax return based on his investment in cattle breeding partnerships established by Walter J. Hoyt III. The Hoyt Partnerships have generated litigation across the country, *see e.g., River City Ranches #1*, 85 T.C.M. (CCH) 1365, 1371, 2003 WL 21205284, and culminated in Mr. Hoyt's fraud conviction and prison sentence of twenty years. Specifically regarding the taxable year 1991, the Commissioner issued a Notice of Final Partnership Administrative Adjustment regarding the deductions and made a computational adjustment on Mortensen's return. This changed Mortensen's claimed loss of $16,720 on the partnership to income of $4,421 and consequently increased Mortensen's tax liability from $724 to $4,642, an increase of $3,918. Section 6662(a) permits a negligence penalty of 20% of the underpayment. The Tax Court found that Mortensen did not carry his burden in proving that the Commissioner's

assessment was erroneous or that Mortensen did what a reasonably prudent person would have done under the circumstances. Thus, the Tax Court affirmed the Commissioner's imposition of the negligence penalty under section 6662(a). Mortensen appeals. For the following reasons, we AFFIRM the Tax Court's decision upholding the negligence penalty.

## I.

The history of these partnerships is complex. Courts have described the partnerships in varying degrees of detail. *See Bales v. Commissioner*, 58 T.C.M. (CCH) 431, 1989 WL 123005; *Mekulsia v. Commissioner*, 389 F.3d 601 (6th Cir. 2004); *Adams v. Johnson*, 355 F.3d 1179 (9th Cir. 2004). Additionally, the Tax Court below provided an excellent description of the partnerships. *Mortensen v. Commissioner*, T.C.M (RIA) 2004-279, 2004 WL 2900972. We therefore only summarize the salient facts.

Mr. Hoyt's father was a prominent breeder of Shorthorn cattle and in the late 1960s began promoting cattle breeding partnerships. When Hoyt's father died in 1972, Hoyt and other family members took over the partnerships and from 1971 through 1998, Hoyt organized, promoted, and operated more than one hundred cattle breeding partnerships. Hoyt acted as the tax matters partner on each of the partnerships that were subject to the Tax Equity & Fiscal Responsibility Act of 1982. *See* 26 U.S.C. § 6231(a)(7); Pub. L. No. 97-248, §§ 402-406, 96 Stat. 324. Hoyt was also the general partner and was responsible for the preparation of the tax returns for each partnership and he typically signed and filed each return. In addition, Hoyt operated tax return preparation companies that prepared most of the investors's individual tax returns. The relevant return, Mortensen's 1991 return, was prepared and signed by Hoyt. Hoyt was also a licensed enrolled agent, meaning that he was authorized, like a lawyer or CPA, to represent taxpayers and argue in proceedings before the Internal Revenue Service. *See* 26 C.F.R. § 601.502; *Adams*, 355 F.3d at 1182 ("Hoyt was accredited by the IRS as an enrolled agent, thereby permitting Hoyt to prepare federal income tax returns for the partnership and to represent the partners in dealings with the IRS."). At the culmination of the IRS's investigation, Hoyt and others were indicted for certain federal crimes — though not tax crimes — and a trial was held in Oregon. The district court described Hoyt's crime as "the most egregious white collar crime committed in the history of the State of Oregon." Hoyt was found guilty on all counts, sentenced to twenty-years imprisonment, and ordered to pay restitution of $102 million.[1]

Mortensen is college educated with a degree in engineering and during the relevant years was employed as a field engineer. At the time he invested in the partnerships, he had no significant investment experience and no experience with farming or cattle. Mortensen first learned of the Hoyt Partnerships from a co-worker in late 1985 or early 1986 and along with four or five co-workers, requested an informational packet from the Hoyt organization. Mortensen received this packet which included various promotional materials prepared by the Hoyt organization. These materials provided rationales for why the partnerships were good investments and why the tax savings were legitimate. The main document was titled "Hoyt and Sons — The 1,000 lb. Tax Shelter," and explained how the partnerships were designed to provide profits to partners over time. This document emphasized that the primary return on investment would be tax savings. *See also Adams*, 355 F.3d at 1181-82 ("Each partner was expected to benefit from the partnership in two ways. First, Hoyt assigned to each partner part of his cattle operation's expenses, which the partners were able

---

[1] At sentencing, the district court stated the following: "[T]he victims in this case were not people that got into this as a matter of personal greed. That the victims in this case were truly victimized by a person who is capable of the greatest deceit — deceitful practices, who deceived everyone around him, including those closest to him . . . [I]t is my strongest recommendation that those remaining cases that remain open be resolved by denying the tax shelter, but to eliminate any penalties, or any interest that may have accumulated." JA 684. Mortensen has pointed to the district court's statement as support for his claims.

to claim as a tax deduction, lowering their tax liability on income from other sources.  Second, in later years the partnerships were expected to produce a profit as each partnership liquidated the livestock that it had been assigned.").

The 1,000 lb. Tax Shelter document contained various statements regarding the purported legality of the tax savings.  After explaining the tax benefits, it stated: "Now, can you feel good about not paying taxes, and feeling like you were not, somehow, abusing the system, or doing something illegal?"  Another section devoted to a discussion of IRS audits stated that the partnerships would be "branded an 'abuse' by the Internal Revenue Service and will be subject to automatic" and "constant audit."  The document further compared the IRS to children, included a cartoon depicting the IRS as a Native American preparing to attack the "HS 'Circle of Wagons,'" and stated that IRS employees did not have the "proper experience and training" or "working knowledge of concepts required by the Internal Revenue Code" to properly evaluate the Hoyt Partnerships.

Another section titled "Tax Aspects" contained a "warning" for investors:

> Out here, tax accountants don't read brands, and our cowboys don't read tax law. If you don't have a tax man who knows you well enough to give you *specific personal advice as to whether or not you belong in the cattle business, stay out*.  The cattle business today cannot be separated from tax law any more than cattle can be separated from grass and water.  *Don't have anything to do with any aspect of the cattle business without thorough tax advice, and don't waste much time trying to learn tax law from an Offering Circular*.

(emphasis added).  Despite its own warning, the circular devoted several pages to explaining the tax benefits of the Hoyt Partnerships and explained why investors should trust *only* Hoyt's organization to prepare their individual tax returns.

> *It is the recommendation of the General Partner, as outlined in the private placement offering circular, that a prospective Partner seek independent tax advice and counsel concerning this investment* . . . The Limited Partners should then authorize the Tax Office of W.J. Hoyt Sons to prepare their personal returns . . . Then you have an affiliate of the Partnership preparing all personal and Partnership returns and controlling all audit activity with the Internal Revenue Service . . . Then, all Partners are able to benefit from the concept of "Circle the Wagons," and no individual Partner can be isolated and have his tax losses disallowed because of the incompetence or lack of knowledge of a tax preparer who is not familiar with the law, regulations, format, procedures, and operations concerning the Partnership that are required to protect the Limited Partners from Internal Revenue audits . . . If a Partner needs more or less Partnership loss any year, it is arranged quickly within the office, without the Partner having to pay a higher fee while an outside preparer spends more time to make the arrangements.

(emphasis added).  The document further warned that an audit or disallowance of the deductions by the Commissioner could take away all or some of the tax benefits and that there would be a possibility that investors would have to pay back the tax savings plus interest and penalties.

Mortensen testified that prior to investing, he conducted an investigation into the partnerships. Specifically, Mortensen testified that after receiving the informational packet from the Hoyt Partnerships, he mailed the packet to his father so that his father could show the information to a tax attorney. Mortensen testified that his father told him that "[t]he attorney looked over it and he said there was nothing illegal." Mortensen testified that he did not know the attorney's name,

what research or investigation the attorney conducted, or essentially any other information that his father told him.

Mortensen also testified that one of his co-workers decided to contact the IRS for information before investing in the partnerships. The co-worker allegedly told Mortensen that "there was no indication from the IRS that there was anything wrong with Hoyt or anything like that." Another co-worker traveled to California "to go to [Hoyt's] offices and also . . . to at least one ranch to be sure that it was a viable business and that there was actually people running a business and there was actually cows involved."

In July 1986, Mortensen invested in a Hoyt Partnership named Durham Genetic Engineering 1986-1. In December, Mortensen signed several documents related to the partnership, including documents that assigned Hoyt power of attorney and gave Hoyt the ability to sign notes on Mortensen's behalf. Mortensen also signed a document expressing his intent to make a capital contribution to and become a limited partner by purchasing units valued at $75,000. Mortensen testified that at the time he made the investment, he believed that it would produce a profit and provide retirement income. Mortensen also believed that he would be liable on the promissory notes, but believed that cattle existed that could be sold to cover the debt.

On Mortensen's 1986 return, the first year of his investment, he reported wage income of $43,112, interest income of $3,126, a partnership loss of $27,170 and an investment credit of $17,412. This led to a zero tax liability. He later filed an amended return, listing the same wage and interest income, but now a partnership loss of $141,260. Mortensen then filed a Form 1045, Application for Tentative Refund, based on a carryback of a claimed net operating loss of $98,148 from 1986.[2] Net operating losses may be carried back three years, and Mortensen did so, resulting in a zero tax liability[3] for 1983, 1984, and 1985 and the refund of $4,821, $7,517, and $6,210 for those years.

Starting with this first return and Form 1045 in 1986 and through the 1991 return, Hoyt or a member of the Hoyt organization prepared Mortensen's tax forms. Mortensen signed the returns without knowing how the Hoyt-related items were calculated. He knew only that Hoyt or a member of the Hoyt organization had entered the items on Schedules K-1 and on his return and he assumed their correctness. Mortensen never had his returns reviewed by an accountant, lawyer, or anyone else outside the Hoyt organization prior to signing and filing them.

Throughout the years of Mortensen's involvement in the Hoyt Partnerships, his investment was transferred between various partnerships without him taking any action. Mortensen testified that he believed that Hoyt was using his power of attorney to do the necessary paperwork. He also testified that he believed one of the reasons for the changes was to maximize tax savings. Hoyt did not provide Mortensen with any type of verification when changes were made or any acknowledgment that his name was taken off promissory notes signed on his behalf.

During the years of his investments, Mortensen made substantial cash payments to the Hoyt organization. These payments totaled approximately $83,000 and included the remittance of his tax refunds, the payment of quarterly and monthly installments on his promissory notes, special "assessments" imposed by the partnership, and contributions to purported individual retirement

---

[2]The $98,148 reflects the excess partnership losses greater than the amount necessary to zero out Mortensen's tax liability for 1986.

[3]Mortensen did, nevertheless, have to pay the alternative minimum tax of $855 in 1984 and $992 in 1985.

account plans maintained by the Hoyt organization. In return, Mortensen received only nominal amounts of his contributions back from the partnership.[4]

For the first time, by letter dated May 23, 1988, the Commissioner notified Mortensen that partnerships SGE 84-2's taxable year 1987 was under review. This letter stated in part:

> Our information indicates that you were a partner in the above partnership during the above tax year. Based upon our review of the partnership's tax shelter activities, we have apprised the Tax Matters Partner that we believe the purported tax shelter deductions and/or credits are not allowable and, if claimed, we plan to examine the return and disallow the deductions and/or credits. The Internal Revenue Code provides, in appropriate cases, for the application [of various penalties].

A similar letter dated May 9, 1989, notified Mortensen that another of his Hoyt Partnerships was under review with respect to taxable year 1988.

In late 1988 and mid-1989, Mortensen contacted the IRS regarding the status of his 1987 refund. By letter, the Commissioner notified Mortensen that his 1984 through 1988 returns were being audited.

Mortensen received additional notices from the Commissioner related to various partnerships, including DSBS 87-C, the partnership at issue in Mortensen's 1991 tax return.[5] These notices were dated August 21, 1989, May 21, 1990, August 13, 1990, February 19, 1991 (two notices), February 3, 1992, and February 18, 1992.

In 1989, Hoyt sent investors a copy of the Tax Court's opinion in *Bales v. Commissioner*, 58 T.C.M. (CCH) 431, 1989 WL 123005. Hoyt claimed that the opinion was proof of the legality of the partnerships. Mortensen testified that he did not read the entire opinion, but understood its basics, and relied upon information from Hoyt in interpreting the opinion.

Sometime in the early 1990s, Mortensen began attending monthly meetings of Hoyt partners that were held near his home. At these meetings, the investors would discuss various issues pertaining to the partnerships with other partners, including partners who had visited the ranches. Based on his attendance at these meetings, Mortensen considered himself "actively aware of the proceedings of the business," and believed that he was materially participating in the partnership.

In January 1992, the Commissioner mailed Hoyt investors a letter regarding the application of 26 U.S.C. § 469, the passive activity loss limitation provision. In response, Hoyt mailed his investors a letter setting forth arguments as to why Hoyt investors materially participated in their investments within the meaning of section 469. This letter asserted that the Commissioner was incorrect and that the investors should do whatever necessary to materially participate in their investments at least 100 to 500 hours per year, depending on the circumstances. Hoyt stated that time spent recruiting new investors and time spent "reading and thinking about these letters" counted toward the material participation requirement.

---

[4] Mortensen's brief states that: "Petitioner received $31,586.83 of his claimed refunds. He paid a total of $83,218.43 to the Hoyt partnerships from 1987 through 1997 for the entire investment period. Thus, Petitioner's net investment after taxes exceeded $50,000.00. It is not expected that Petitioner will ever be able to collect the money Hoyt stole from him." Brief of Appellant at 19.

[5] The underlying partnership adjustment in this case was made with respect to claimed deductions based on expenses for Durham Shorthorn Breeding Syndicate 1987-C or DSBS 87-C. Although Mortensen's 1991 return takes deductions based on investment in this partnership, there are no documents in the record pertaining to any investment by Mortensen in the partnership.

By letter dated February 11, 1992, the Commissioner mailed the investors a response stating that "[i]n Mr. Hoyt's letter misleading and/or inaccurate premises were made which may directly affect you and your decision-making process in filing your 1991 individual tax return." The letter went on to state that Hoyt had provided his investors with rulings and court cases superseded by section 469 and were no longer relevant. The letter further informed investors that, contrary to Hoyt's claims, time spent "reading and thinking" about the letters did not count as material participation in their investments. The letter concluded by stating that the Commissioner "recommend[s] you consider having an independent accountant or attorney review this matter with you."

Whenever Mortensen received any correspondence from the Commissioner, he would send copies to the Hoyt organization. Mortensen took no other action and never sought independent advice from an accountant or attorney.

Mortensen also received from Hoyt, numerous documents claiming to show the legitimacy of the partnerships and the legality of the tax claims made by the organization. The Hoyt organization would portray IRS employees as incompetent and claimed that they were engaging in unjust harassment of the Hoyt investors. Mortensen testified that he trusted these documents and believed and relied upon what the Hoyt organization told him. He did not, however, seek independent advice.

After the February 18, 1992 notice from the Commissioner regarding the examination of various partnerships that Mortensen was involved in, the Commissioner froze the refunds that Mortensen had claimed on his 1987 and 1988 returns. Nevertheless, on April 22, 1992, before filing his 1991 tax return, Mortensen signed another series of documents evidencing his intent to invest in another partnership known as SGE 84-2.

On his 1991 tax return, Mortensen reported wage income of $48,405, interest income of $4,512, loss from partnership SGE 84-2 of $39,160, loss from DSBS 87-C of $16,720, capital gain of $13,003, farm income of $4,824, IRA deduction of $2,000, adjusted gross income of $12,864, and a total tax liability of $724. The losses from the two partnerships were reported on Schedules K-1. The capital gain and IRA deduction are derived from SGE 84-2. Mortensen attached a material participation statement claiming to have spent 121 hours during 1991 working in various Hoyt-related activities. Hoyt signed the return as preparer on June 18, 1992, and Mortensen signed it on July 26.

The Commissioner ultimately issued a Notice of Final Partnership Administrative Adjustment to Mortensen with respect to DSBS 87-C that disallowed various deductions claimed on his return for 1991. Mortensen did not challenge the disallowance of the deductions. Therefore, the Commissioner made a computational adjustment against Mortensen changing his claimed DSBS 87-C loss of $16,720 to income of $4,421. This increased Mortensen's tax liability by $3,918. The Commissioner then assessed a 20% penalty pursuant to section 6662(a) based on the determination that Mortensen is liable for negligence or disregard of rules or regulations with respect to the amount of underpayment resulting from the DSBS 87-C computational adjustment.

Mortensen challenged the Commissioner's assessment of the 6662(a) penalty for negligence in the United States Tax Court. Special Trial Judge Goldberg held a trial where Mortensen was the only witness to testify. After trial, the court issued a detailed forty-three page opinion upholding the Commissioner's determination. The court determined that Mortensen "was negligent in signing the power of attorney forms and in entering into the investment." *Mortensen v. Commissioner*, T.C.M (RIA) 2004-279, 1756. The court further concluded that Mortensen was "negligent in 1991 in claiming the Hoyt partnership loss at issue in this case; namely, the $16,720 loss from DSBS 87-C." *Id.* at 1757. The court rejected Mortensen's reasonable cause and good faith defenses as

objectively unreasonable. *Id.* at 1757-1760. In sum, and "[o]n the basis of the record before the Court, [it] conclude[d] that petitioner's actions in relation to the Hoyt investment constituted a lack of due care and a failure to do what a reasonable or ordinarily prudent person would do under the circumstances." *Id.* at 1762. The court found Mortensen negligent with respect to entering into the investment and negligent with respect to claiming the DSBS 87-C loss on his return. *Id.* Mortensen now appeals to this Court.

## II.

The only issue on appeal is whether the Tax Court erred in upholding the Commissioner's imposition of the 6662(a) penalty for the tax year 1991.

### A. Standard of Review

Mortensen did not challenge the Commissioner's disallowance of the various deductions. The only challenge is to the assessment of the negligence penalty pursuant to section 6662(a). "We review the factual findings of the Tax Court in this regard under the clearly erroneous standard." *Pasternak v. Commissioner*, 990 F.2d 893, 902 (6th Cir. 1993) (citing *Leuhsler v. Commissioner*, 963 F.2d 907, 910 (6th Cir. 1992)); *see also Roberson v. Commissioner*, 142 F.3d 435, *5 (6th Cir. 1998) (unpublished) ("We reverse the Tax Court's factual finding that [the taxpayer] acted negligently . . . only if the Tax Court clearly erred."). The Commissioner's decision to impose the negligence penalty is presumptively correct and the taxpayer has the burden of proving that he did not act negligently and that he did what a reasonably prudent person would have done under the circumstances. *Pasternak*, 990 F.2d at 902 (citing *Skeen v. Commissioner*, 864 F.2d 93, 96 (9th Cir. 1989)). The Tax Court's finding that a taxpayer failed to meet his burden of proving due care is a finding of fact that this Court reverses only if clearly erroneous. *Pasternak*, 990 F.2d at 902.

### B. Negligence

A taxpayer is not required to be perfect for this would be an unrealistic expectation. Even tax specialists cannot be perfect. The Code is complex. Reasonable minds can differ over tax reporting and sometimes the IRS disallows certain transactions. Every time a transaction is challenged or disallowed, the taxpayer is not liable for penalties. Only those taxpayers who fail to meet the applicable standard of care — to do what a reasonable taxpayer would do under the circumstances — can be slapped with negligence penalties and interest. Again, perfection is not required, but when the predators are circling, no reasonable ostrich sticks its head in the sand. *See* American Ostrich Association: Fact or Fiction, *available at* http://www.ostriches.org/factor.html#head (stating that ostriches do not stick their heads in the sand). The ostrich that does pays the penalty.

This Court has defined negligence as "lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances." *Id.* (quoting *Leuhsler*, 963 F.2d at 910). Negligence also includes "any failure to make a reasonable attempt to comply with the provisions of the Internal Revenue Code." *Roberson*, 142 F.3d at *4. Negligence is strongly indicated when a "taxpayer fails to make a reasonable attempt to ascertain the correctness of a deduction, credit or exclusion on a return which would seem to a reasonable and prudent person to be 'too good to be true' under the circumstances." Treas. Reg. § 1.6662-3(b)(1)(ii). Thus, we judge Mortensen's conduct against that of the reasonable and ordinarily prudent person.

In applying the negligence standard, the Tax Court determined that Mortensen was negligent both in entering into the investment and in reporting the losses for 1991. The Tax Court cited Mortensen's decision to grant Hoyt the authority to sign promissory notes on his behalf up to $75,000, as well as the authority to control the investments without any sort of confirmation or consultation. The court faulted Mortensen for placing his trust entirely with the promoters of the

investment and concluded that he did not adequately "investigate either the legitimacy of the partnerships or the implications of the promissory notes." *Mortensen*, T.C.M (RIA) 2004-279, 1756. This trust continued throughout, despite the constant switching of investments from partnership to partnership and without Mortensen ever inquiring about or knowing the status of promissory notes signed on his behalf. *Id.*

The Tax Court noted that from 1986 through 1991, Mortensen used the partnerships to report a total federal income tax liability of $4,349 on income totaling $290,149. Mortensen further filed the Form 1045 purporting to completely eliminate his tax liabilities for the three years prior to his investment in the partnerships and resulting in a requested refund of $18,548. *Id.* These large tax benefits were based *solely* on advice received from Hoyt and Mortensen never questioned the amounts on the returns and never had the returns reviewed by an independent tax professional. *Id.*

The Tax Court also noted that the initial Hoyt promotional materials included various warnings and advised Mortensen to consult with an independent tax advisor. The court stated that Mortensen's

> failure to inquire is especially notable with respect to petitioner's 1986 return and amended return. In preparing petitioner's amended return for that year, the Hoyt organization prepared a statement in which it was claimed that petitioner's partnership interest had been switched from DGE 86-1 to SGE 84-2. At that time, however, petitioner had signed partnership agreements and other documents pertaining only to SGE 86; the investment documents in the record show that petitioner did not invest in SGE 84-2 until April 1992.

*Id.* Moreover, in the first year of his investment, Mortensen was given a loss allocation of $141,260 and did not question these amounts even though they purported to eliminate his tax liability for 1982 through 1986. *Id.* Thus, the court found that Mortensen should have been on notice from the beginning that something was amiss or that the tax savings were "too good to be true" and should have sought independent advice.

With regard to the 1991 return, the Tax Court noted that Mortensen did not know how the reported losses were derived and knew only that Hoyt reported them on Mortensen's Schedules K-1 and his return. *Id.* at 1756-57. Mortensen "claimed these losses despite the fact that [the Commissioner] had been warning [Mortensen], at least since May 1988, that there were potential problems with the tax claims being made on both the partnership returns and on [Mortensen]'s returns. Prior to signing his 1991 return, [Mortensen] had received at least 12 separate letters from [the Commissioner] alerting [him] to suspected problems or alerting [him] to reviews that had been commenced with respect to various Hoyt partnerships in which he was involved." *Id.* at 1757. Despite these warnings, Mortensen did not further investigate the partnership losses and did not seek outside guidance before claiming them in full on his 1991 tax return. *Id.* Based on this, the Tax Court concluded that Mortensen was "negligent in 1991 in claiming the Hoyt partnership loss at issue in this case; namely, the $16,720 loss from DSBS 87-C." *Id.*

### C. Mortensen's Defenses to the Negligence Penalty

Section 6664(c)(1) states that the section 6662(a) penalty is not imposed "with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion." According to the Treasury Regulations, "[t]he determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances." Treas. Reg. § 1.6664-4(b)(1). The most important factor in making this determination is the extent of the taxpayer's effort to ascertain his proper tax liability.

Pursuant to section 6664(c)(1), Mortensen claims that he reasonably investigated and relied on others who similarly investigated. The Supreme Court has held that good faith reliance on professional advice concerning the tax laws may be a defense to negligence. *United States v. Boyle*, 469 U.S. 241, 250-51 (1985). In order for reliance on professional tax advice to be reasonable, however, the advice must generally be from a competent and independent advisor unburdened with a conflict of interest and not from promoters of the investment. *Pasternak*, 990 F.2d at 903 ("Although petitioners argue that they relied on advice of 'financial advisors, industry experts, and professionals,' the purported experts were either promoters themselves or agents of the promoters. Advice of such persons can hardly be described as that of 'independent professionals.'"); *Barlow v. Commissioner*, 301 F.3d 714, 723 (6th Cir. 2002) (noting "that courts have found that a taxpayer is negligent if he puts his faith in a scheme that, on its face, offers improbably high tax advantages, without obtaining an objective, independent opinion on its validity"); *Illes v. Commissioner*, 982 F.2d 163, 166 (6th Cir. 1992) (finding negligence where taxpayer relied on person with financial interest in the venture); *Goldman v. Commissioner*, 39 F.3d 402, 408 (2d Cir. 1994); *Ryback v. Commissioner*, 91 T.C. 524, 565, 1988 WL 92157 (1988) (sustaining negligence penalty where taxpayers relied solely on advice of persons not independent of investment promoters). In addition, the taxpayer must demonstrate that any expert opinion relied upon was rendered by the expert with knowledge of the pertinent facts necessary to render such advice. *Barlow*, 301 F.3d at 724 ("[R]eliance must be reasonable and the taxpayer must show that the accountant had all the necessary information to make an informed decision.") (citations omitted).

Mortensen first claims reasonable reliance based on information provided by Hoyt and representatives of the Hoyt organization. As the above citations demonstrate, however, essentially all courts have found reliance on the promoters of the investment insufficient to support a good faith defense. Secondly, as the Tax Court found, there is no evidence that Mortensen ever sought advice regarding his *deductions*, but rather, when he received his Schedule K-1 and tax returns, assumed that they were correct. Even assuming that Mortensen received and relied upon advice from the Hoyt organization, "Mr. Hoyt and his organization created and promoted the partnership, they completed petitioner's tax return, and they received the bulk of the tax benefits from doing so. For petitioner to trust Mr. Hoyt or members of his organization for tax advice and/or to prepare his return under these circumstances was inherently unreasonable." *Mortensen*, T.C.M (RIA) 2004-279, 1758.[6]

Mortensen further points to Hoyt's "enrolled agent" status and claims that he reasonably relied upon a person certified by the IRS to practice before it. Enrolled agents are required to pass an exam given by the IRS demonstrating their competence prior to being accredited as enrolled agents. As we stated earlier, Hoyt was an enrolled agent, accredited by the IRS to prepare federal tax returns for the partnerships and to represent partners in proceedings before the IRS. *See also Adams*, 355 F.3d at 1182. Enrolled agent status is certainly relevant in proceedings before the Service. A taxpayer's reliance on an enrolled agent's advice, however, does not insulate the taxpayer from negligence penalties. An enrolled agent is not a representative of the IRS, but is merely an individual authorized to appear before the Service. Much like a taxpayer's reliance on an attorney or an accountant, reliance on an enrolled agent is a factor we may consider in determining the reasonableness of a taxpayer's actions, but in circumstances such as these, where the enrolled agent is also the promoter of the investment, any purported reliance is of little to no value.

---

[6] Mortensen also argues that he relied upon tax professionals hired by the Hoyt organization. The Tax Court found no evidence to indicate that Mortensen relied on any of these professionals and no indication of what details or advice they allegedly provided. Moreover, these tax professionals are also affiliated with the Hoyt organization as promoters. We see no error in this finding.

Aside from his reliance on persons with a conflict of interest, Mortensen also claims to have made a pre-investment investigation and points to it as sufficient to support his reasonable cause claim. As part of this investigation, Mortensen points to three actions: (1) reliance on the opinion of his father's tax attorney, (2) reliance on his co-worker's alleged contact with the IRS, and (3) reliance on his co-worker's trip to the Hoyt offices. The Tax Court assumed the veracity of Mortensen's claims, but nevertheless, rejected Mortensen's claim that he "reasonably relied upon any advice from a tax professional concerning the Hoyt investment." *Mortensen*, T.C.M (RIA) 2004-279, 1758. We find no error in the Tax Court's conclusion.

Mortensen first claims that he relied on his father's tax attorney. The crux of this claim is that Mortensen mailed his father the informational packet he initially received from Hoyt and his father gave it to a tax professional to review. According to Mortensen's testimony, his father told him that "[t]he attorney looked over it and he said there was nothing illegal." *Id.* The Tax Court found that Mortensen's testimony on this point was "vague and lacked any degree of detail." *Id.* Mortensen was unable to explain what information the tax professional relied upon, did not know his name (or even if it was a tax accountant or tax lawyer), and had no written statement from the professional. In sum, the Tax Court found "that petitioner did not reasonably rely on any advice that he received from the professional through his father because any such advice was not provided by someone who had all the necessary information to make an informed decision, and because the advice was conclusory and did not address any of the specific risks involved in an investment, including the tax risks." *Id.* at 1758-59. The Tax Court's conclusion is in-line with this Court's decisions. In *Barlow*, this Court held that the taxpayer "failed to show [that he] acted reasonably or that [the tax professional] had all the information to make an informed decision." *Barlow*, 301 F.3d at 724. In *Roberson*, this Court likewise rejected the taxpayer's claim where he could not demonstrate the tax preparer's knowledge of or expertise in the particular investment field or that the preparer made any "investigation of the bona fides of the investment." *Roberson*, 142 F.3d at *5. Moreover, this Court rejected Roberson's reliance on accountants who prepared his tax returns for two years "because they neither evaluated the merits of the claimed tax credits and deductions, nor made any inquiries into the bona fides of the investment." *Id.* Thus, there is no support for the conclusion that the Tax Court clearly erred in rejecting Mortensen's purported reliance on the alleged tax professional.

Mortensen next points to his co-worker's alleged contact with the IRS. This co-worker apparently told Mortensen that "there was no indication from the IRS that there was anything wrong with Hoyt or anything like that." *Mortensen*, T.C.M. (RIA) 2004-279, 1758. The Tax Court found that "the record is completely devoid of any detail concerning what information he provided to the IRS or what information he received in return." *Id.* at 1759. Finally, Mortensen claims that another co-worker traveled to a Hoyt ranch to confirm that there were actually cows and an operating business. With regard to this factor, the Tax Court found that "there has been no suggestion that this coworker had any background in cattle ranching or was otherwise qualified to investigate the Hoyt organization." The Tax Court's decision to reject these two purported good faith reliance claims is likewise consistent with this Court's case law. *See, e.g., Leuhsler*, 963 F.2d at 910 (holding that even unsophisticated investors cannot escape a negligence penalty by claiming reliance on the advice of those who are not professional investment counselors). Again, there is no evidence that the Tax Court clearly erred in its conclusion.

The Tax Court further found that even if Mortensen did rely on these individuals, this reliance was five years before the 1991 return at issue. In the intervening time, Mortensen took large deductions nearly wiping out his tax liability from 1983 through 1992. According to the Tax Court, "in light of the large losses claimed by the partnerships, the discrepancies in the partnerships in which petitioner was involved, and the continuous warnings being sent by [the Commissioner]," Mortensen's reliance "was unreasonable under the circumstances." *Mortensen*, T.C.M. (RIA) 2004-279 at *33-34; *see also Pasternak*, 990 F.2d at 903 (stating that "a reasonably prudent person would

have asked a tax advisor if this windfall were not 'too good to be true'"); *Brown v. Commissioner*, 43 T.C.M. (CCH) 1322, 1324, 1982 WL 10532 ("To anyone . . . not incorrigibly addicted to the 'free lunch' philosophy of life, the entire scheme had to have been seen as a wholly transparent sham."). In these circumstances, a reasonable taxpayer would not, as Lyndon Johnson once said, act like a prairie rabbit in a hailstorm and just hunker down until it passes. Mortensen did, and the district court did not clearly err in so finding.

Finally, Mortensen argues that an "average" taxpayer would have been unable to uncover the fraud perpetrated by Hoyt. The Tax Court did not reject this assertion, but made clear that the issue is not whether Mortensen could or should have uncovered the fraud, but whether he was negligent in "not adequately investigating the partnership and/or seeking qualified independent advice concerning it." *Mortensen*, T.C.M. (RIA) 2004-279 at \*34. We agree. The law does not require taxpayers to uncover anything and everything that the Service, with all of its resources, finds problematic, sometime down the line. At issue here are tax laws designed to encourage taxpayers to be informed and to be in compliance with the laws; the negligence penalties are not designed to punish reasonable mistakes. The issue is not whether a taxpayer is wholly successful in determining the tax legitimacy of a desired investment, but whether he is negligent for not reasonably investigating in the first place.[7]

It is also relevant to point out the warnings in the initial Hoyt promotional materials that Mortensen ignored. One document was titled "Hoyt and Sons — The 1,000 lb. Tax Shelter."[8] The documents emphasized that the main return on investment was tax savings. The documents posed the question whether the investors could feel good about not paying taxes and if they could feel like they were not abusing the system. The documents informed investors up front that the partnerships would be "branded an 'abuse' by the Internal Revenue Service and will be subject to automatic" and "constant audit." A warning was given in the "Tax Aspects" section of the documents stating that "If you don't have a tax man who knows you well enough to give you specific personal advice as to whether or not you belong in the cattle business, stay out . . . Don't have anything to do with any aspect of the cattle business without thorough tax advice, and don't waste much time trying to learn tax law from an Offering Circular." Despite these statements, Mortensen's investigation into the tax aspects was minimal to the extent it existed at all. The Tax Court therefore did not clearly err in its determinations.

Mortensen's most credible claim is that he had reasonable cause for the underpayment because of the Tax Court's opinion in *Bales v. Commissioner*. *Bales* addressed individual investors in Hoyt partnerships for the taxable years 1974-1979. The Commissioner had asserted various deficiencies for underpayment of taxes based on deductions for partnership losses. The Tax Court began the opinion by stating that "[t]he 26 dockets which were tried are test cases for petitioners in similar partnerships." *Bales*, 58 T.C.M. (CCH) at 432. The case specifically involved ten issues for decision regarding the appropriateness of the transactions and the deductions and held that the partnerships should be respected for tax purposes and deductions to the extent of the investors's investment were permissible. After the decision, Hoyt sent Mortensen and other investors a copy and his summary, touting it as proof of the partnerships' legitimacy.

---

[7]Mortensen also claims that an "honest mistake of fact" excuses him from a negligence penalty under section 6664(c)(1) (excusing "an honest misunderstanding of fact or law that is reasonable in light of all the facts and circumstances, including the experience, knowledge and education of the taxpayer"). The Tax Court found that this claim does not alter the conclusion that Mortensen was still negligent in investigating or seeking independent advice. Thus, the claimed honest mistake is insufficient to carry the burden of proving reasonable cause.

[8]Interestingly, Hoyt later mailed a letter to his investors stating that "[t]he position of your partnership is that it is not a tax shelter," because tax shelters "are never recognized for Federal income tax purposes." *Mortensen*, T.C.M. (RIA) 2004-279, 1753. The IRS then informed the investors that not all tax shelters were illegal.

The Tax Court below rejected Mortensen's reliance on *Bales*. The court reasoned that "*Bales* involved different investors, different partnerships, different taxable years, and different issues than those underlying the present case." *Mortensen*, T.C.M. (RIA) 2004-279, 1761. The court then found that Mortensen failed to establish that he relied on *Bales* to support his deductions. According to the Tax Court, there was no evidence that Mortensen *personally* relied upon the decision, as opposed to relying on Hoyt's interpretation of the decision. Because the Tax Court had already concluded that reliance on Hoyt was unreasonable, any reliance on him for an interpretation of *Bales* was likewise unreasonable. The Tax Court further re-asserted that "*Bales* involved different investors, different partnerships, different taxable years, and different facts." *Id.* Moreover, the court noted that not all of the deductions claimed by the investors were permitted, but rather only those to the extent of their investments. *Id.* Further, the court noted that in *Durham Farms #1 v. Commissioner*, 79 T.C.M. 2009, *aff'd* 59 Fed. Appx. 952 (9th Cir. 2003), it found that by the early 1980s, the Hoyt organization's management and record keeping practices changed dramatically. *Mortensen*, T.C.M. (RIA) 2004-279, 1761.

Although we believe it to be a closer case on this issue, we cannot conclude that the Tax Court clearly erred by finding Mortensen's claimed reliance on *Bales* insufficient to defeat the penalty. Nevertheless, the Tax Court's decision in *Bales* does lend some support to Mortensen's claim. At the outset of the *Bales* opinion, the court stated that the case was a "test case[] for petitioners in similar partnerships." *Bales*, 58 T.C.M. (CCH) at 432. The taxable years were 1974-1979, well prior to Mortensen's investment, but assuming he did read the opinion, as he testified that he did, there are many statements in the opinion that could arguably support a reasonable cause defense. First, the Tax Court stated that "[t]he Hoyt cattle operation, which encompasses the partnerships' cattle, is surely one of the top Shorthorn seedstock operations in the United States." *Id.* at 445. The Tax Court further stated that the Commissioner "has not offered sufficient evidence to show that this was anything but a first class purebred Shorthorn operation." *Id.* at 446. Later in the opinion, the Tax Court noted that, given the partnerships' structure, "it would have been quite possible for Jay Hoyt to manipulate things to his own advantage. Yet there is no indication that he did so. In fact, the evidence in the record shows that he ran the operation for the investors' benefit."[9] *Id.* at 448. The court then concluded that "these transactions clearly had economic substance. Accordingly, the transactions will not be disregarded as shams." *Id.* at 449.

The court did account for the fact that "[a]t first glance, it appears that this is a package of tax benefits. With a minimum of investment, petitioners were able to claim large deductions from the activity. They did this by purportedly personally assuming partnership debt. Petitioners had no expertise in the area. The assets were very high priced. And, the promoter of the investments also prepared the investors' personal tax returns." *Id.* Nevertheless, the court did not disregard the transactions as shams, but did note that "[a]fter trial, petitioners conceded that the assumption of debt and loss allocations was impermissible. The deductions petitioners are still claiming are limited to the extent of their investments . . . There is no doubt that tax savings play an important role in these investments. Yet there are profits to be made independent of tax savings. There is a real chance that petitioners will profit from capital appreciation." *Id.* 449-50.

Although we find the Tax Court's analysis of *Bales* lacking — in an otherwise well-reasoned and well-written opinion — we ultimately agree that Mortensen has failed to carry his burden. In support of Mortensen's claim, we note that the *Bales* court stated at the outset that *Bales* was a test case of similar partnerships. Further, the Tax Court below relied upon *Durham Farms #1* where the court noted that the Hoyt partnerships' records deteriorated in the early 1980s. *Durham Farms #1*,

---

[9] The finding here is likely correct. Subsequent opinions have concluded that the problems and fraud in the Hoyt operations began in the early 1980s. Thus, the evidence that the Tax Court reviewed for 1974-79 likely demonstrated a first class operation, which later allowed Hoyt to create and promote so many partnerships based on his family name.

however, was issued by the Tax Court in 2000, and Mortensen's negligence penalty is for 1991.**[10]** The Tax Court also based its decision on the fact that Mortensen said he relied more on Hoyt's interpretation of the case and did not entirely understand *Bales* when he read it. The very beginning of the opinion, however, mentions that *Bales* was a test case. The opinion clearly states that the partnerships were "first class," that they should be respected for tax purposes, and deductions to the extent of basis were permitted. Even an uneducated investor could certainly understand these statements. Further, the *Bales* court did not express concern with the fact that Hoyt prepared all of the investors's tax returns, nor did it express concerns with the form of the partnerships. Mortensen testified that he read and understood the basics of the opinion — which, to nearly anyone who reads it, would appear to be a positive endorsement of the partnerships.

Of course, although good faith reliance on professional tax advice — and, in this case, an opinion of the Tax Court — may be a defense to negligence, *Boyle*, 469 U.S. at 250-51, "[r]eliance on professional advice, standing alone, is not an absolute defense to negligence, but rather a factor to be considered," *Freytag v. Commissioner*, 89 T.C. 849, 888 (1987), *aff'd*. 904 F.2d 1011 (5th Cir. 1990), *aff'd*. 501 U.S. 868 (1991). Even reliance on a judicial opinion must be reasonable under the circumstances. The *Bales* opinion, though having significant similarities, also has, as the Tax Court wrote, various differences. Business operations are fluid and a court's opinion or approval of transactions for a certain period does not stamp them as legitimate for all time. Nor does the *Bales* opinion have any preclusive effect on the Commissioner's ability to challenge deductions for other years. And finally, *Bales* did not address any of the partnerships that Mortensen was invested in (and it is unclear whether Mortensen himself would have known what partnerships he was invested in anyway). If, based upon the *Bales* opinion, Mortensen had sought independent professional advice or, perhaps, a private letter ruling from the IRS, his reliance might be more justified.

In sum, Mortensen relies heavily on *Bales* as reasonable cause for his underpayment of taxes. The Commissioner counters that, even if Mortensen relied on *Bales*, a reasonable taxpayer would have sought independent professional advice concerning the case's applicability to his particular partnership investments. Both Mortensen and the Commissioner make strong arguments based on *Bales.* The case does provide Mortensen with some support for his reasonable cause argument. Balanced against the other issues, however, specifically the absence of any records substantiating the claimed deductions, the large deductions with a small investment, warnings about seeking independent counsel, and constant warnings from the Commissioner himself, there is a sufficient basis for the Tax Court's decision that a reasonable taxpayer after *Bales* would still have sought independent counsel. Additionally, although not addressed by the Tax Court, *Bales* held that the taxpayers could take deductions only to the extent of their basis. Mortensen took more than $300,000 in partnership loss deductions on an investment of approximately $83,000 between 1986-1991. The amount of deductions, therefore, would not comply with *Bales*.

### III.

Finally, we note again that the Tax Court's finding that a taxpayer failed to carry his burden of proving his reasonable care is reversed only if clearly erroneous. Although, at least with regard to *Bales*, it may be a closer case than the Tax Court found below, we cannot conclude that the Tax Court's decision is clearly erroneous. AFFIRMED.

---

**[10]**To the extent that the Tax Court below meant that the shoddy records beginning in the early 1980s should have put Mortensen on notice of a problem, it did not explain, nor does the Commissioner on appeal, how or why Mortensen should have recognized a problem.