T.C. Memo. 2020-121

UNITED STATES TAX COURT

NIRAV B. BABU, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

NIRAV BABU, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 8649-17, 20266-18.[1]          Filed August 17, 2020.

Gerald W. Kelly, Jr., Daniel S. Heller, Vadim D. Ronzhes, Derek W.

Kaczmarek, and David R. Jojola, for petitioner.

Richard J. Hassebrock, Evan K. Like, and Gary R. Shuler, Jr., for

respondent.

_____

[1]Nirav B. Babu and Nirav Babu are the same person. We consolidated these cases for trial, briefing, and opinion by order dated July 23, 2019.

[*2]     MEMORANDUM FINDINGS OF FACT AND OPINION

LAUBER, <u>Judge</u>:  With respect to petitioner's Federal income tax for 2013 and 2014, the Internal Revenue Service (IRS or respondent) determined deficiencies and accuracy-related penalties as follows:

| Year | Deficiency | Penalty |
|------|-----------|---------|
| 2013 | $338,752 | $67,750 |
| 2014 | 7,030,829 | 1,406,166 |

For 2013 petitioner has conceded all of the adjustments including the penalty, subject to respondent's concession that he is entitled to an additional deduction of $79,500 from Schedule C, Profit or Loss From Business.  For 2014 the parties have both made numerous concessions, including concessions by respondent that eliminated unreported income adjustments exceeding $14 million. The parties' concessions are set forth in a joint stipulation of settled issues filed October 16, 2019, which is incorporated by this reference.

Particularly relevant for this opinion are petitioner's concessions that Refunds Plus, LLC, a passthrough entity of which he was the sole member, had gross receipts of $2,819,433 for 2014 and that he failed to report on Schedule E, Supplemental Income and Loss, $2,908,220 of flow-through income from that entity. The sole question remaining for decision is whether that failure generates an

**[*3]** accuracy-related penalty for an underpayment attributable to a substantial understatement of income tax.  <u>See</u> sec. 6662(a), (b)(2), (d)(1).[2]  We resolve this question in respondent's favor.

FINDINGS OF FACT

The parties filed multiple stipulations of facts with accompanying exhibits that are incorporated by this reference.  Petitioner resided in Maryland when he filed his petitions.

After earning a B.A. degree in finance petitioner attended law school at the University of Baltimore, graduating in 2005.  During law school he took courses in tax law, participated in a tax clinic that assisted low-income taxpayers, and finished "with a pretty good understanding of tax."  In 2006 he became licensed to practice law in three jurisdictions and maintained those licenses through 2013.

During law school petitioner was employed by Instant Tax Services (ITS), which at the time was one of the largest tax return preparation firms in the country. He assisted Fesum Ogbazion, the owner of ITS, in opening four ITS stores in the Baltimore area.  During law school petitioner served as area manager for those locations, and after graduating he served for five years as general counsel for ITS.

---

[2]All statutory references are to the Internal Revenue Code (Code) in effect at the relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure.  We round all monetary amounts to the nearest dollar.

**[*4]** ITS operated on a franchise basis, supplying store owners with software that they used to prepare and process returns. While serving as ITS' general counsel petitioner began acquiring ITS franchises, and by 2013 he held franchises for 19 separate ITS locations. These franchises were profitable, netting aggregate profits exceeding $800,000 for petitioner during 2008-2010.

In March 2012 the U.S. Department of Justice (DOJ) filed a civil complaint against ITS, Ogbazion, and related entities seeking to enjoin them from "engaging in and facilitating extensive and pervasive tax fraud." A two-week trial was held before the U.S. District Court for the Southern District of Ohio in July 2013. On November 6, 2013, that court permanently enjoined Ogbazion and ITS from engaging in any business involving the preparation or filing of Federal tax returns.

Petitioner regarded Ogbazion as a close friend and mentor. Although petitioner was not a named defendant in the injunction case, he was singled out in the court's opinion as having been complicit in the abusive conduct in which ITS engaged. This conduct included assisting Ogbazion in concealing $5 million in a secret bank account to avoid creditors.

Because of petitioner's close association with Ogbazion, the DOJ would not approve any arrangement that enabled petitioner to take over the tax preparation business formerly conducted by ITS. That business was taken over by Great Tax,

[*5] LLC (GTX), a new tax preparation firm wholly owned by John Mirlisena. Many store owners that had been ITS franchisees signed up with GTX, offering to consumers tax preparation services similar to those that ITS had previously provided.

In December 2013, roughly a month after the court issued its injunction against ITS, petitioner formed and became the sole member of Refunds Plus, LLC (RP), an S corporation for Federal tax purposes. Petitioner acquired from Ogbazion and made available to RP the tax processing software that ITS had previously used. During 2014 RP provided services to GTX by using this software to process tax returns for GTX customers, most or all of whom expected refunds.

Mr. Mirlisena agreed that RP would be paid a fee of $100.95 for each GTX return that it processed claiming a refund. In many such cases the customer received a "refund loan" from GTX. In that event RP's processing activity included dividing the tax refund (once received from the IRS) into "buckets" corresponding to the sums due GTX (for repayment of the loan), RP (for its $100.95-per-return fee), the store owner (for its fee), and the taxpayer (if anything was left over). Because the fees due RP were segregated into a separate "bucket," petitioner was aware at all times of the amounts that GTX owed RP.

[*6]  Petitioner opened bank accounts for RP, but they showed little activity during 2014.[3]  However, on January 2, 2014, petitioner and Mr. Mirlisena executed deposit account control agreements that authorized petitioner to withdraw cash from GTX's bank accounts.  Petitioner was permitted access to any GTX account and did not need to secure consent from GTX or Mr. Mirlisena before making withdrawals.  Exercising this authority petitioner wired well over $3 million out of GTX's bank accounts, to himself and others, during 2014.[4]

Petitioner maintained no formal books or records tracking RP's income and expenses during 2014.  During that year RP processed almost 30,000 returns for GTX and thereby earned a fee of $100.95 per return.  On its 2014 Federal income tax return RP checked the box electing the cash basis of accounting and reported that it had zero gross receipts.  The parties now agree that RP during 2014 in fact had gross receipts of $2,819,433 from GTX and that petitioner failed to report, on his individual return, $2,908,220 of flow-through income from RP.

---

[3]RP had four bank accounts.  Two had no activity during 2014, and the other two had aggregate deposits of $18,000.

[4]The record shows that these withdrawals were very substantial, but does not establish the exact amount.  In subsequent litigation (eventually settled) Mr. Mirlisena averred that petitioner had withdrawn about $17.5 million from GTX's bank accounts during 2014.

[*7]   In February 2017 and July 2018 the IRS issued petitioner timely notices of deficiency for 2013 and 2014, respectively.[5]  He timely petitioned with regard to each notice.  On October 16, 2019, the parties filed a stipulation of settled issues resolving all issues but one--whether petitioner is liable for an accuracy-related penalty with respect to the portion of the 2014 deficiency attributable to his failure to report flow-through income from RP.  See sec. 6662(b)(2).  He contends that he relied on professional advice as to the proper reporting.  Alternatively he contends that, because RP received no payments directly from GTX during 2014, he reasonably concluded that RP, as a cash basis taxpayer, had no gross receipts.

At trial we heard testimony from petitioner, Mr. Mirlisena, Arun Chawla (petitioner's return preparer), and Chelsea Rebeck (an accountant and attorney with whom petitioner had business dealings).  Mr. Mirlisena credibly testified that petitioner, pursuant to the deposit account control agreements, was authorized to withdraw from GTX's bank accounts--and did withdraw during 2014--amounts comfortably exceeding the fees that RP was owed for the return-processing services it furnished GTX.

---

[5]Petitioner filed joint returns for both years; his wife separately contested her liability and is not a party to these cases.

**[*8]** Mr. Chawla prepared the 2014 returns for petitioner and RP, and those returns were filed on August 6 and August 20, 2015, respectively. Mr. Chawla and his staff prepared these returns on the basis of the information petitioner gave them. Mr. Chawla did not review petitioner's own bank accounts or books and records. He did not question petitioner's representation that RP had no gross receipts, noting that RP was a new company with bank accounts that showed minimal activity. Petitioner did not inform Mr. Chawla that RP had processed almost 30,000 returns for GTX during 2014, that RP had charged a fee of $100.95 per return, or that petitioner had withdrawn well over $3 million from GTX's bank accounts during 2014.

Ms. Rebeck obtained a law degree in 2012 and had been practicing law full time for less than a year as of August 2015. Petitioner hired Ms. Rebeck to represent him in a dispute with the IRS involving the assessment of penalties for alleged violation of section 6695(g), which requires return preparers to exercise due diligence regarding claims for the earned income credit. On September 7, 2015, she filed a Form 2848, Power of Attorney and Declaration of Representative, to represent him before the IRS in that matter.

Ms. Rebeck and petitioner testified that she also provided him with tax advice--before Mr. Chawla filed petitioner's and RP's returns in August 2015--that

**[*9]** RP was not required to report any gross receipts for 2014. We did not find either's testimony on that point credible. Petitioner's testimony was self-serving, and Ms. Rebeck did not strike the Court as an objective or candid witness.

Petitioner and Ms. Rebeck had mutual business interests, insufficiently explained, that involved large sums of money. Ms. Rebeck acquired former ITS franchises that appeared to have used RP's software to process returns. In 2015 she and petitioner started a law firm whose bank account balances exceeded $3.8 million by January 2016. In early 2018 petitioner transferred $500,000 to Ms. Rebeck for unexplained reasons. At some point she transferred to petitioner a 99.9% interest in an LLC for no consideration. Petitioner and Ms. Rebeck were codefendants in a lawsuit filed in 2019 involving alleged misappropriation of funds. For these and other reasons, we found that Ms. Rebeck's testimony was likely to be biased in petitioner's favor.

There was no documentary evidence to support Ms. Rebeck's testimony that she gave petitioner timely advice about the positions taken on his and RP's 2014 returns. She supplied no evidence of letters, memos, or emails--dated before those returns were filed--in which she advised petitioner about the reporting of RP's gross receipts. She supplied no billing records documenting any tax preparation work performed for petitioner or RP before August 2015. There is no evidence

[*10] that Ms. Rebeck devoted substantive attention to the question of RP's gross receipts until after the IRS selected the 2014 returns for examination.

Petitioner's and RP's returns for 2014 were prepared by Mr. Chawla and his staff, not by Ms. Rebeck. There is no evidence that Ms. Rebeck communicated with Mr. Chawla or any member of his staff about those returns before they were filed. There is no evidence that petitioner informed Mr. Chawla or his staff that he had received tax advice from Ms. Rebeck or (if he had) what that advice was.

OPINION

The sole question we must decide is whether petitioner is liable for an accuracy-related penalty on account of his failure to report $2,908,220 of flow-through income from RP for 2014. Section 7491(c) generally provides that "the Secretary shall have the burden of production in any court proceeding with respect to the liability of any individual for any penalty." This burden requires the Commissioner to come forward with sufficient evidence indicating that imposition of the penalty is appropriate. See Higbee v. Commissioner, 116 T.C. 438, 446 (2001). Once the Commissioner meets this burden, the burden of proof is on the taxpayer to "come forward with evidence sufficient to persuade a Court that the Commissioner's [penalty] determination is incorrect." Id. at 447.

**[\*11]** The Code imposes a 20% penalty upon the portion of any underpayment of tax that is attributable to (among other things) "[a]ny substantial understatement of income tax." Sec. 6662(a), (b)(2). An understatement of income tax is "substantial" if it exceeds the greater of $5,000 or 10% of the tax required to be shown on the return. Sec. 6662(d)(1)(A). Petitioner concedes that he failed to report $2,908,220 of flow-through income from RP for 2014. The record shows (and petitioner does not dispute) that the understatement of income tax attributable to this failure (and to the other adjustments petitioner has conceded) exceeds $5,000 and 10% of the total tax required to be shown on his return. Respondent has thus carried his burden of production to show a "substantial understatement of income tax." See sec. 7491(c).

The Commissioner's burden of production under section 7491(c) also includes establishing compliance with section 6751(b), which requires timely supervisory approval of penalties. See Chai v. Commissioner, 851 F.3d 190, 217, 221-222 (2d Cir. 2017), aff'g in part, rev'g in part T.C. Memo. 2015-42; Graev v. Commissioner, 149 T.C. 485 (2017), supplementing and overruling in part 147 T.C. 460 (2016). The record reflects and petitioner concedes that the IRS secured timely supervisory approval for the penalties determined in the 2014 notice of deficiency.

**[*12]** The section 6662 penalty does not apply to any portion of an underpayment "if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to * * * [it]." Sec. 6664(c)(1). The decision as to whether the taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs. Circumstances that may signal reasonable cause and good faith "include an honest misunderstanding of fact or law that is reasonable in light of all of the facts and circumstances, including the experience, knowledge, and education of the taxpayer." Ibid.

Reasonable cause can be shown by good-faith reliance on the advice of a qualified tax professional. Sec. 1.6664-4(b)(1), (c), Income Tax Regs. To establish this defense the taxpayer must prove that: (1) the adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer fully disclosed all relevant facts to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment. Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002).

Petitioner does not contend (and could not plausibly contend) that he relied on advice from Mr. Chawla regarding the proper reporting of RP's gross receipts. Mr. Chawla performed no independent evaluation of this question; he simply re-

**[\*13]** ported the figures that petitioner gave him. Petitioner did not inform Mr. Chawla that RP had processed almost 30,000 returns for GTX during 2014, that RP charged a fee of $100.95 per return, or that he had withdrawn well over $3 million from GTX's bank accounts during 2014. Petitioner obviously did not fully disclose all relevant facts to Mr. Chawla. See ibid.

Petitioner contends that he relied on advice from Ms. Rebeck regarding the reporting of RP's gross receipts. We find this argument deficient for a number of reasons. On the whole, Ms. Rebeck was not a credible witness, and her financial entanglements with petitioner raised serious questions about her objectivity. See 106 Ltd. v. Commissioner, 136 T.C. 67, 79 (2011) ("[A]dvice must generally be from a competent and independent advisor unburdened with a conflict of interest[.]" (quoting Mortensen v. Commissioner, 440 F.3d 375, 387 (6th Cir. 2006), aff'g T.C. Memo. 2004-279)), aff'd, 684 F.3d 84 (D.C. Cir. 2012).

The theories that Ms. Rebeck offered at trial to justify not reporting RP's gross receipts were implausible. She suggested that the money petitioner withdrew from GTX's bank accounts reflected repayments of loans he had made personally to GTX, rather than payments of return-processing fees that GTX owed RP. But she could point to no evidence documenting the purported loans. Ms. Rebeck alternatively suggested that RP did not have to report any gross receipts

**[\*14]** because it had supposed bad debt deductions exceeding its gross receipts. She offered no legal or factual support for that theory. All in all, Ms. Rebeck's testimony raised serious questions as to whether she was "a competent professional who had sufficient expertise to justify reliance." Neonatology Assocs., 115 T.C. at 99.

In any event, we found no credible evidence, documentary or testimonial, that Ms. Rebeck supplied tax advice regarding the reporting of RP's gross receipts, to petitioner or Mr. Chawla, before petitioner's and RP's 2014 returns were filed in August 2015. She supplied no letters, memos, or emails addressing this subject that were dated before August 2015, and she supplied no billing records documenting any tax preparation work done for petitioner or RP before August 2015. There is no evidence that Ms. Rebeck devoted substantive attention to the question of RP's gross receipts until after the IRS selected the 2014 returns for examination. The theories she enunciated at trial struck the Court as post hoc rationalizations for petitioner's erroneous reporting.

Putting aside any purported tax advice, petitioner contends that he believed it reasonable to report RP as having no gross receipts because RP was a cash basis taxpayer that received no payments directly from GTX during 2014. As a condition of performing return-processing services for GTX, however, petitioner

[*15] insisted that Mr. Mirlisena execute deposit account control agreements enabling petitioner to withdraw cash from GTX's bank accounts. Exercising this authority petitioner wired well over $3 million out of GTX's bank accounts, to himself and others, during 2014. That sum comfortably exceeded the amount that RP was owed for processing almost 30,000 tax returns for a fee of $100.95 per return.

Petitioner was a lawyer with at least seven years of intensive experience in the business of preparing Federal income tax returns. By his own admission he emerged from law school "with a pretty good understanding of tax." His argument, in essence, is that RP had no gross receipts because he, as RP's sole member, deposited directly into his bank accounts the fees that RP was owed for the services it performed. We do not believe that petitioner actually misunderstood the tax law that makes this argument a nonstarter. It is obvious and well established that a shareholder cannot avoid current taxation by diverting a company's gross receipts to himself. See, e.g., DiLeo v. Commissioner, 96 T.C. 858, 883-885 (1991) (finding shareholders liable for tax when they deposited a portion of their corporation's gross receipts into secret bank accounts), aff'd, 959 F.2d 16 (2d Cir. 1992). But assuming arguendo that he did, we find that his misunderstanding was not "reasonable in light of all of the facts and circumstances," including his

[*16] experience, education, and knowledge of tax law.  See sec. 1.6664-4(b)(1), Income Tax Regs.

For these reasons, we find that petitioner has failed to carry his burden of demonstrating reasonable cause for his failure to report $2,908,220 of flow-through income from RP for 2014.  We accordingly hold that he is liable for an accuracy-related penalty with respect to the portion of his underpayment attributable to that failure.[6]

To reflect the foregoing,

Decisions will be entered under Rule 155.

---

[6]Petitioner does not dispute that he is liable for an accuracy-related penalty with respect to the portion of the underpayment attributable to the other 2014 adjustments that he has conceded.