T.C. Memo. 2006-131


UNITED STATES TAX COURT


MICHAEL W. KELLER, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 9662-01.                    Filed June 22, 2006.


<u>Asher B. Bearman</u>, <u>Jaret R. Coles</u>, <u>Jennifer A. Gellner</u>, <u>Terri A. Merriam</u>, and <u>Wendy S. Pearson</u>, for petitioner.

<u>Catherine J. Caballero</u>, <u>Gregory M. Hahn</u>, <u>Nhi T. Luu-Sanders</u>, and <u>Thomas N. Tomashek</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

HAINES, <u>Judge</u>:  Respondent determined deficiencies in petitioner's Federal income taxes of $11,106 and $17,410 for 1994 and 1995, respectively.  Respondent further determined that petitioner was liable for accuracy-related penalties under

section 6662(h) of $4,442 and $6,932, respectively.[1]  After

concessions,[2] the only issues for decision are:  (1) Whether

petitioner is liable for 40-percent accuracy-related penalties

under section 6662(h); and (2) in the alternative, whether

petitioner is liable for 20-percent accuracy-related penalties

under section 6662(b)(1) or (2).

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

The first, second, and third stipulations of fact and the

attached exhibits are incorporated herein by this reference.

Petitioner resided in Escondido, California, when he filed his

petition.

A.    Hoyt and the Hoyt Partnerships

The issues in this case revolve around petitioner's

investment in a partnership organized and promoted by Walter J.

Hoyt III (Hoyt).  Hoyt's father was a prominent cattle breeder.

To expand his business and attract investors, Hoyt's father

started organizing and promoting cattle breeding partnerships in

the late 1960s.  Before his father's death in early 1972, Hoyt

---

[1]  All section references are to the Internal Revenue Code,
as amended, and all Rule references are to the Tax Court Rules of
Practice and Procedure.  Amounts are rounded to the nearest
dollar.

[2]  Petitioner concedes that:  (1) He did not realize any
farm income in 1994 and 1995; and (2) he is not entitled to the
deductions claimed on Schedules F, Profit or Loss From Farming,
attached to his 1994 and 1995 Federal income tax returns.

and other members of the Hoyt family were extensively involved in organizing and operating numerous cattle breeding partnerships.

From about 1971 through 1998, Hoyt organized, promoted, and operated more than 100 cattle breeding partnerships (Hoyt partnerships). Hoyt also organized, promoted, and operated sheep breeding partnerships.

From 1983 until his removal by the Tax Court in 2000 through 2003, Hoyt was the tax matters partner of each Hoyt partnership. From approximately 1980 through 1997, Hoyt was a licensed enrolled agent, and as such, he represented many of the Hoyt partners before the IRS. In 1998, Hoyt's enrolled agent status was revoked.

Hoyt also operated tax return preparation companies, including "Tax Office of W.J. Hoyt Sons", "Agri-Tax", and "Laguna Tax Service" (Laguna). These companies prepared most of the Hoyt investors' tax returns.

B.   Petitioner's Background and Involvement With Hoyt

Petitioner is married and has two stepchildren. Petitioner has a bachelor of science degree in marine transportation and management and has been employed by Military Sealift Command since June 1982.

Before his involvement with Hoyt, petitioner's only experience in investing included an investment of $20,000 in the stock market in 1982 and the purchase of two homes in 1990 and

1994, respectively.  He had never been a partner in a partnership.

Petitioner's only experience in farming came in the late 1970s, when he spent a couple of weeks milking cows.  Petitioner has never purchased livestock.  Petitioner is not an expert in cattle or embryo valuation and has no knowledge of the success rate of embryo transplants in cattle.

Petitioner first heard about the Hoyt organization in 1985 from several coworkers.  At that time, petitioner understood that Hoyt was in the business of breeding cattle, that the business was profit motivated, and that investment in a Hoyt partnership would minimize a partner's tax liability.  Petitioner did not invest in 1985, taking a "wait-and-see attitude" because the investment "just [sounded] too good to be true."

In 1994, petitioner talked to current and former coworkers, including Joe Trodglen (Trodglen), about Hoyt and the tax benefits of investing in a Hoyt partnership.  In December 1994, petitioner told Trodglen that he wanted to invest in the Hoyt organization.  Trodglen provided petitioner with Hoyt promotional materials, including a pamphlet entitled "Registered Livestock Purchase Guide" (the purchase guide).  The purchase guide provides an outline of Hoyt's partnerships and "investment opportunities."  Many sections are devoted to tax considerations, including tax benefits and tax risks.  The purchase guide states:

Cattle ranchers use the tax benefits Congress has given us.  Some of us bring the tax benefits to town, sell them for cash to help pay to produce the beef. The cows produce beef, <u>and</u> tax benefits for their owners.  Ranchers sell the beef at the store, and the tax benefits to provide additional capital.  The cash raised from the selling of both items is enough to pay for the cattle purchase and the operating expenses. Those that buy the beef get a steak.  Those that buy the tax benefits have the opportunity for ownership in the cattle herd.

Again, <u>you only considered making an investment in the cattle business AFTER you heard about the tax benefits.</u>  Tax benefits were your <u>incentive</u>.  They encouraged you to make a high risk business investment.

> \*   \*   \*   \*   \*   \*   \*

In the country, tax accountants don't read brands, and cowboys don't read tax law.  If you must have a <u>tax man</u> give you specific personal advice as to whether or not you belong in the cattle business, stay out.

> \*   \*   \*   \*   \*   \*   \*

A change in the tax laws or an audit and disallowance by the IRS could take away all or part of the tax benefits, plus the possibility of having to pay the tax along with penalties and interest.

Petitioner also received a pamphlet entitled "Registured [sic]

Livestock:  The Real 'Bull Market' Business Opportunities" (the

business opportunities pamphlet).  On its cover, the business

opportunities pamphlet states "HARVESTING TAX SAVINGS BY FARMING

THE TAX CODE", and it contains much of the same information as

the purchase guide.

On February 14, 1995, petitioner sent to the Hoyt

organization a "Confidential Buyers Information" form, requesting

an "information package".  Dave Barnes (Barnes), a Hoyt employee,

responded on February 17, 1995, thanked petitioner for his interest, provided him with promotional materials, and requested that he "fill out the enclosed credit application and return it with copies of your tax returns for the years 1991, 1992, and 1993, so I can review your qualifications for your livestock purchase." The promotional materials included copies of the purchase guide and the business opportunities pamphlet provided to petitioner by Trodglen. Petitioner sent the requested information to Barnes in March 1995.

Sometime in early 1995, petitioner met with Barnes at Elk Grove, a Hoyt ranch, to further discuss "investment opportunities".[3] Their meeting lasted approximately 3 hours, during which Barnes explained Bales v. Commissioner, T.C. Memo. 1989-568 (the Bales case, or Bales) and spent at least 15 minutes discussing tax benefits.

After talking to Barnes, petitioner decided to invest. Petitioner did not consult a tax attorney, an accountant, or an expert in the cattle industry before he invested.

On April 15, 1995, David Cross (Cross), a Hoyt employee, sent petitioner a letter stating:

> After reviewing your information we are comfortable with your income, you can afford the payments on 73 head [of cattle].

---

[3] It is not clear whether this meeting took place before or after petitioner requested information from Hoyt.

You are now ready for the next step. As soon as possible, please get your 1994 taxes to Laguna Tax Service. Dave Barnes will take them, the copies of your 1991, 1992 and 1993 returns. Laguna will calculate your tax savings to verify what we have figured.

On July 28, 1995, petitioner purportedly purchased 73 "Registured [sic] Durham Shorthorn Bred Heifers" and 73 "confirmed embryos" from W.J. Hoyt Sons Ranches MLP (Hoyt Ranches) for $956,980. Hoyt determined the number of cattle petitioner could purchase and set the purchase price without petitioner's input. Petitioner did not see any of the cattle that he was purchasing. Petitioner initially thought he was purchasing only cattle and did not realize he was also purchasing embryos until he received the "Sales Order", described infra.

In connection with the purchase, petitioner signed and/or received a "Livestock Bill of Sale", a "Certificate of Warranty", a "Sales Order", a "Fifteen Year Promissory Note", and a "Security Agreement" on July 28, 1995.

The "Livestock Bill of Sale" (bill of sale) indicated that petitioner, "D.B.A. Durham Genetic Engineering 1990-2",[4] purchased the Durham shorthorn cattle described on the attached schedule for a "total purchase price" of $956,980. The schedule included the names and other information for 73 Durham Shorthorn heifers. The bill of sale did not mention confirmed embryos or

_____

[4] Petitioner was a partner in Durham Genetic Engineering 1990-2 J.V. (DGE). For more information, see infra note 5.

indicate that any part of the total purchase price was paid for those embryos.

The "Certificate of Warranty" guaranteed that all heifers listed on the bill of sale would be able to reproduce for 10 consecutive years.

The "Sales Order" indicated that petitioner purchased 73 Durham Shorthorn heifers for $478,490 and 73 confirmed embryos for $478,490.

To fund his purchase of cattle, petitioner signed a "Fifteen Year Promissory Note" (promissory note), agreeing to pay Hoyt Ranches $956,980. The promissory note provided that petitioner was required to pay interest in 50 monthly installments of $1,075, beginning on September 1, 1995. Beginning in August 2000, petitioner was required to pay 10 percent of the unpaid principal each year until the entire debt was satisfied. Petitioner did not keep a copy of the promissory note for his records.

To secure repayment of the promissory note, petitioner signed a "Security Agreement", granting Hoyt Ranches a security interest in all cattle purchased or bred by petitioner. Petitioner did not keep a copy of the security agreement for his records.

On July 31, 1995, petitioner signed a "Share-Crop Board Agreement" (board agreement). The board agreement provided that

W.J. Hoyt Sons Management Co. would breed and board all of petitioner's cattle.  Petitioner did not keep a copy of the board agreement for his records.

Petitioner did not have any records of what happened to the cattle or the embryos after he purchased them.  Petitioner did not request from Hoyt, nor did Hoyt provide, any written account of his cattle.

Other than a $50 application fee, petitioner did not incur any upfront costs related to his investment.  However, petitioner agreed to remit to the Hoyt organization 75 percent of any tax refunds received.  In connection with his 1991, 1992, and 1993 refunds totaling $40,740, see infra, petitioner paid to Hoyt $30,500.  In connection with his 1994 refund of $11,773, see infra, petitioner paid to Hoyt $10,500.  Petitioner also made 10 interest payments to Hoyt of $1,075 between September 8, 1995, and May 28, 1996.

C.   Petitioner's Tax Claims

Before investment in the Hoyt organization, petitioner usually prepared his own tax returns.  On his tax returns for 1991, 1992, and 1993, petitioner reported the following:

| Year | Total income | Total tax |
|------|--------------|-----------|
| 1991 | $81,574 | $10,662 |
| 1992 | 70,094 | 9,035 |
| 1993 | 107,841 | 21,043 |

Petitioner's 1994 and 1995 tax returns were prepared and signed by Hoyt and listed Laguna as the preparer's firm. Petitioner provided Laguna with his Forms W-2, Wage and Tax Statement, and with information regarding his Schedule A itemized deductions.  However, petitioner did not provide Laguna with any of the information used to prepare the Schedules F.  Laguna also prepared for petitioner a Form 1045, Application for Tentative Refund.

After the returns and the application for refund were prepared, Laguna forwarded them to petitioner for his review and signature.  Petitioner signed and filed the returns and the application without having them reviewed by an accountant or attorney outside of the Hoyt organization.

Petitioner filed his 1994 Federal income tax return on December 25, 1995.  On an attached Schedule F,[5] petitioner

---

[5]  This Court has heard numerous Hoyt-related cases.  In the majority of those cases, the issues for decision revolved around partnership losses taken by taxpayers as partners in various Hoyt-operated partnerships.  See, e.g., Mortensen v. Commissioner, 440 F.3d 375, 387 (6th Cir. 2006), affg. T.C. Memo. 2004-279; Van Scoten v. Commissioner, 439 F.3d 1243, 1253 (10th Cir. 2006), affg. T.C. Memo. 2004-275; Hansen v. Commissioner, T.C. Memo. 2004-269; cf. Jaroff v. Commissioner, T.C. Memo. 2004-276.

Petitioner was a partner in DGE and was issued Schedules K-1, Partner's Share of Income, Credits, Deductions, Etc., for 1994 and 1995.  However, unlike the majority of taxpayers in Hoyt cases, petitioner did not report any partnership items on his returns.  Instead, petitioner reported income and losses on
(continued...)

reported the following:

| | |
|---|---|
| Farm income, sales of livestock | $152,059 |
| Depreciation | (247,842) |
| Interest expense | (8,830) |
| "1994 Sharecropboard Exp" | (121,647) |
| "Expense for the cost basis of purchased cattle that died" | (76,558) |
| Net farm profit or (loss) | (302,818) |

With respect to the depreciation deduction, petitioner attached a depreciation schedule reporting a cost basis in his "registured [sic] cattle" of $880,423. Petitioner subtracted his net farm loss of $302,818 from wage and interest income totaling $72,942 for total negative income of $229,876. Petitioner reported zero taxable income and zero tax due. Petitioner reported taxes withheld of $11,773 and requested a refund of that amount, which respondent issued.

In December 1995, petitioner also filed a Form 1045 seeking to carry back to 1991, 1992, and 1993 net operating losses of $231,952 realized in 1994. As a result of the carryback, petitioner reported decreases in tax of $10,662, $9,035, and

---

[5](...continued)
Schedules F as if he were directly involved in the farming activity.

Respondent issued to petitioner a notice of final partnership administrative adjustment (FPAA) with respect to his partnership interest in DGE. In a motion to dismiss for lack of jurisdiction, petitioner argued that this Court lacked jurisdiction over the Schedule F items because they were partnership items or affected items, referring to the FPAA. Petitioner's motion was denied because the Court concluded that the Schedule F items were not partnership items or affected items.

$21,043 for 1991, 1992, and 1993, respectively.  Respondent

issued refunds in those amounts on February 5, 1996.

Petitioner filed his 1995 Federal income tax return on

August 5, 1996.  On an attached Schedule F, petitioner reported

the following:

| | |
|---|---|
| Farm income, sales of livestock | $80,928 |
| Depreciation | (83,351) |
| Interest expense | (24,600) |
| "1994 Sharecropboard exp" | (80,928) |
| Net farm profit or (loss) | (107,951) |

With respect to the depreciation deduction, petitioner attached a

depreciation schedule reporting a cost basis in his "registured

[sic] cattle" of $625,100.  Petitioner subtracted his net farm

loss of $107,951 from wage, interest, and capital gains income

totaling $132,527 for total income of $24,576.  After subtracting

other deductions, petitioner reported zero taxable income and

zero taxes due.  Petitioner reported taxes withheld of $8,788 and

requested a refund of that amount.  Respondent did not issue a

refund for 1995.

D.    Respondent's Review of Petitioner's Tax Claims

On January 10, 1996, nearly 7 months before petitioner filed

his 1995 return, respondent sent petitioner a prefiling notice.

The prefiling notice informed petitioner that he had been

identified as an investor in a tax shelter promoted by Hoyt.  It

further informed petitioner that deductions relating to the tax

shelter would not be allowed and that claiming such deductions

could result in the imposition of an accuracy-related penalty under section 6662.

After receiving the prefiling notice, petitioner visited Barnes at Elk Grove Ranch. Barnes told petitioner that the letter was a part of an "ongoing bitter battle" and that Hoyt was still an enrolled agent. Barnes took petitioner on a tour of Elk Grove and the Laguna office and showed him a copy of the Bales case and other documents.

On February 24, 1997, respondent sent petitioner a letter indicating that petitioner's 1994 and 1995 tax years were under examination.

On May 3, 2001, respondent sent petitioner a notice of deficiency. Respondent disallowed all of petitioner's Schedule F deductions for 1994 and 1995 and determined that the "Farm income, sales of livestock" listed on the Schedules F were not includable in income.[6] As a result, respondent determined deficiencies in petitioner's Federal income taxes of $11,106 and $17,410 for 1994 and 1995, respectively. Respondent further determined that the underpayments of tax were attributable to gross valuation misstatements, and therefore petitioner was liable for 40-percent accuracy-related penalties under section 6662(h) of $4,442 and $6,932, respectively.

---

[6] Petitioner has conceded that he did not receive farm income and is not entitled to any Schedule F deductions for 1994 and 1995. See supra note 2.

In response to the notice of deficiency, petitioner filed his petition with this Court on August 2, 2001.

In an amendment to answer filed May 18, 2005, respondent asserted that, in the alternative to the 40-percent penalties under section 6662(h), petitioner is liable for 20-percent accuracy-related penalties under either section 6662(b)(1) or (2).

## OPINION

### A.  Accuracy-Related Penalties in General

Under section 6662(a), a taxpayer may be liable for a 20-percent penalty on the portion of an underpayment of tax attributable to negligence or disregard of rules or regulations or to a substantial underpayment of tax.  Sec. 6662(a) and (b)(1) and (2).  The section 6662(a) penalty is increased to 40-percent when the underpayment of tax is the result of "gross valuation misstatements".  Sec. 6662(h)(1).  However, no penalty is imposed under section 6662 if there is reasonable cause for the underpayment of tax and the taxpayer has acted in good faith. Sec. 6664(c)(1).

### B.  Burden of Proof

Generally, a taxpayer bears the burden of proving the Commissioner's determinations incorrect.  Rule 142(a)(1); Welch

v. Helvering, 290 U.S. 111, 115 (1933).[7]  However, the
Commissioner bears the burden of proof with respect to any new
matter raised in the answer.  Rule 142(a).  The parties agree
that petitioner bears the burden of proof with respect to the
penalties under section 6662(h).  The parties also agree that
respondent bears the burden of proof with respect to the
penalties under section 6662(b)(1) and (2) because respondent
asserted these penalties in his amendment to answer.

C.   Section 6662(h):  Gross Valuation Misstatements

Under section 6662(h), a taxpayer may be liable for a 40-
percent penalty on any portion of an underpayment of tax
attributable to gross valuation misstatements.  However, no
penalty is imposed unless the portion of such underpayment
exceeds $5,000.  Sec. 6662(e)(2).  A gross valuation misstatement
means any substantial valuation misstatement, as determined under
section 6662(e), by substituting "400 percent" for "200 percent".
Sec. 6662(h)(2)(A).  There is a substantial valuation
misstatement if "the value of any property (or the adjusted basis
of any property) claimed on any return * * * is 200 percent or
more of the amount determined to be the correct amount of such

---

[7]  While sec. 7491 shifts the burden of proof and/or the
burden of production to the Commissioner in certain
circumstances, this section is not applicable in this case
because respondent's examination of petitioner's returns did not
commence after July 22, 1998. See Internal Revenue Service
Restructuring and Reform Act of 1998, Pub. L. 105-206, sec.
3001(c), 112 Stat. 727.

valuation or adjusted basis". Sec. 6662(e)(1)(A). In other words, there is a gross valuation misstatement when the value or basis claimed on a return is 400 percent or more of the correct value or basis.

Respondent determined that the full amounts of petitioner's underpayments of tax were attributable to gross valuation misstatements. For 1994, petitioner's underpayment was attributable to the disallowance of the Schedule F deductions for depreciation, "the cost basis of purchased cattle that died" (cost basis deduction), interest, and "sharecropboard" expenses. For 1995, petitioner's underpayment was attributable to the disallowance of the Schedule F deductions for depreciation, interest, and "sharecropboard" expenses. Because the interest and sharecropboard expenses did not depend on valuation or basis statements, any underpayments of tax resulting from their disallowance cannot be based on gross valuation misstatements. See Jaroff v. Commissioner, T.C. Memo. 2004-276. However, the depreciation and cost basis deductions depended on petitioner's reported bases in cattle. Therefore, 40-percent penalties may apply to petitioner's underpayments resulting from the disallowance of the depreciation and cost basis deductions if the bases petitioner reported were gross valuation misstatements. See id.

On his 1994 return, petitioner reported a "cost basis of purchased cattle that died" of $76,558 and a cost basis in his "registured [sic] cattle" of $880,423. On his 1995 return, petitioner reported a cost basis in his "registured [sic] cattle" of $625,100. As stated above, petitioner bears the burden of proof with respect to the section 6662(h) penalties. Therefore, petitioner bears the burden of proving that the reported bases were not gross valuation misstatements.

Petitioner does not argue that the reported bases were correct or were less than 400 percent of the correct bases (and thus not gross valuation misstatements). Instead, "It is Petitioner's position that he never received the benefits and burdens of ownership of the purported cattle--if such cattle even existed, thus the overvaluation penalty cannot apply." Petitioner's position is without support.

If we accept petitioner's assertion that he never received the benefits and burdens of ownership of the cattle, or that the cattle never existed, then his bases in the cattle would be zero. See Zirker v. Commissioner, 87 T.C. 970, 978-979 (1986) (finding that no actual sale of cattle took place and the correct adjusted basis of cattle was zero); Massengill v. Commissioner, T.C. Memo. 1988-427 (same as Zirker), affd. 876 F.2d 616 (8th Cir. 1989). This conclusion is supported by petitioner's concession that he was not entitled to cost basis or depreciation deductions. If

petitioner's correct bases are zero, then the bases claimed on his returns are considered to be 400 percent or more of the correct amount, and are thus gross valuation misstatements. See sec. 1.6662-5(g), Income Tax Regs.; see also Zirker v. Commissioner, supra at 978-979.

Petitioner failed to meet his burden of proving that his reported bases were not gross valuation misstatements. We hold that petitioner's underpayments of tax resulting from the disallowance of the cost basis and depreciation deductions were attributable to gross valuation misstatements. Unless the total of the underpayments attributable to gross valuation misstatments is less than $5,000, or petitioner had reasonable cause for the underpayments, petitioner will be liable for 40-percent penalties under section 6662(h) on the underpayments of tax attributable to the items described in this paragraph.[8]

D.  Section 6662(b)(1):  Negligence or Disregard of Rules or Regulations

Under section 6662(a) and (b)(1), a taxpayer may be liable for a 20-percent penalty on an underpayment of tax which is attributable to negligence or disregard of rules or regulations. "Negligence" includes any failure to make a reasonable attempt to

---

[8] As part of the Rule 155 computations, the parties shall determine whether the total of petitioner's underpayments discussed in this paragraph exceeds $5,000. If the parties determine that the total does not exceed $5,000, then those underpayments will instead be subject to the 20-percent penalty under sec. 6662(b)(1), as discussed infra.

comply with the provisions of the Internal Revenue Code.  Sec. 6662(c).  The regulations under section 6662 provide that negligence is strongly indicated where a taxpayer "fails to make a reasonable attempt to ascertain the correctness of a deduction, credit or exclusion on a return which would seem to a reasonable and prudent person to be 'too good to be true' under the circumstances".  Sec. 1.6662-3(b)(1)(ii), Income Tax Regs.

Negligence is defined as the "'lack of due care or failure to do what a reasonable or ordinarily prudent person would do under the circumstances.'"  Neely v. Commissioner, 85 T.C. 934, 947 (1985) (quoting Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), affg. in part and remanding in part on another ground 43 T.C. 168 (1964)); see Allen v. Commissioner, 925 F.2d 348, 353 (9th Cir. 1991), affg. 92 T.C. 1 (1989).  Negligence is determined by testing a taxpayer's conduct against that of a reasonable, prudent person.  Zmuda v. Commissioner, 731 F.2d 1417, 1422 (9th Cir. 1984), affg. 79 T.C. 714 (1982).  Courts generally look both to the underlying investment and to the taxpayer's position taken on the return in evaluating whether the taxpayer was negligent.  Sacks v. Commissioner, 82 F.3d 918, 920 (9th Cir. 1996), affg. T.C. Memo. 1994-217.  When an investment has such obviously suspect tax claims as to put a reasonable taxpayer under a duty of inquiry, a good faith investigation of the underlying viability, financial structure, and economics of

the investment is required.  Roberson v. Commissioner, T.C. Memo. 1996-335 (citing LaVerne v. Commissioner, 94 T.C. 637, 652-653 (1990), affd. without published opinion sub nom. Cowles v. Commissioner, 949 F.2d 401 (10th Cir. 1991), affd. without published opinion 956 F.2d 274 (9th Cir. 1992), and Horn v. Commissioner, 90 T.C. 908, 942 (1988)), affd. without published opinion 142 F.3d 435 (6th Cir. 1998).

Petitioner testified that he invested in Hoyt's program as a means to provide for retirement.  However, other than a couple of weeks spent milking cows, petitioner had no background in farming or cattle ranching.  Before his investment, he had not been a partner in a partnership.  Petitioner was not an expert in cattle or embryo valuation, nor had he purchased any livestock.

Petitioner relied on Hoyt to determine the number of cattle he could purchase.  He further relied on Hoyt to establish a purchase price of $478,490 for 73 heifers and $478,490 for 73 embryos.  To facilitate this purchase, petitioner signed a promissory note for $956,980 and testified that he believed he would be held personally liable for the entire amount.  Before signing the note and completing the transaction, petitioner did not see the cattle he was purchasing, nor is there any indication that he attempted to do so.

Despite his lack of experience or expertise with ranching, partnerships, cattle and embryo valuation, and livestock

purchases, petitioner put himself at risk for nearly $1 million without consulting any independent investment advisers or cattle valuation experts. Petitioner did not even have a clear understanding of what he was purchasing. He initially thought he was purchasing 73 head of cattle for $956,980, which was also indicated in the letter from Cross and the bill of sale. Yet the sales order indicates that he was purchasing 73 heifers for $478,490 and 73 embryos for $478,490. There is no indication that petitioner questioned this discrepancy. He did not examine the cattle and the embryos he was purchasing. He did not even keep copies of the promissory note, the security agreement, or the board agreement. For these reasons, we conclude that petitioner was negligent in entering into the investment.

The record is replete with facts that should have put petitioner on notice of the suspect tax claims made on his tax returns. First, and most obvious, is the timing of petitioner's deductions. Petitioner's first contact with the Hoyt organization was in February 1995. Petitioner did not begin his investment until July 28, 1995. Despite this, petitioner claimed Schedule F deductions on his 1994 return and then used the net operating loss generated by those deductions to claim refunds for 1991, 1992, and 1993. Petitioner could not provide a rational explanation of why he began taking Schedule F deductions in 1994 for an investment he entered into in 1995.

On his self-prepared returns for 1991, 1992, and 1993, petitioner reported total taxes of $10,662, $9,035, and $21,043, respectively. On his returns for 1994 and 1995, prepared by Laguna, petitioner reported zero total tax despite having roughly the same total income (not including Schedule F items) as in 1991 through 1993. The relative change in petitioner's total tax was attributable solely to the Schedule F deductions. Petitioner realized these significant tax benefits and received refunds from the net operating loss carrybacks while incurring no upfront costs.

Before petitioner filed his 1995 return, respondent informed petitioner that he had been identified as an investor in a tax shelter and his Hoyt-related deductions would not be allowed. Despite this warning, petitioner did not seek independent advice but continued to rely on the assurances of Barnes, a Hoyt employee. After he received the warning, petitioner still claimed Schedule F deductions related to his Hoyt investment on his 1995 return.

Other facts that should have put petitioner on notice of the suspect tax claims include: (1) The promotional materials petitioner received from Hoyt included warnings about significant tax risks; and (2) petitioner testified that he was investing in a partnership, yet he claimed purported losses as Schedule F losses instead of partnership losses.

Despite these red flags, petitioner did not consult a tax attorney or an accountant outside of the Hoyt organization, nor did he have his returns reviewed by an independent tax return preparer. Petitioner claimed the tax benefits from the Schedule F losses solely on the advice he received from the promoters of the investment. He relied exclusively on Laguna, a Hoyt entity, to prepare his returns. In other words, he relied on the same people who were to receive 75 percent of his tax refunds. Given the suspect tax claims, petitioner did not meet his duty of inquiry or make a good faith investigation. Petitioner did not exercise due care and failed to do what a reasonable or ordinarily prudent person would do given the facts surrounding petitioner's investment. Therefore, we find that respondent has met his burden of proof and hold that petitioner's underpayments of tax for 1994 and 1995 were the result of negligence. Unless petitioner had reasonable cause, petitioner will be liable for 20-percent penalties under section 6662(b)(1) on his underpayments of tax to the extent that those underpayments are not already subject to the 40-percent penalties under section 6662(h).

E.   Section 6662(b)(2):  Substantial Understatement of Income Tax

The accuracy-related penalty under section 6662 cannot exceed 20-percent of the underpayment of tax (or 40 percent if attributable to gross valuation misstatements). Sec. 1.6662-

2(c), Income Tax Regs.  The penalties cannot be stacked, even when the taxpayer's understatement of income is attributable to more than one of the types of misconduct listed in section 6662(b).  Id.  Because petitioner's underpayments of tax were the result of either gross valuation misstatements or negligence, we need not consider whether those underpayments were also the result of substantial understatements of income tax.

F.   Alleged Defenses to the Accuracy-Related Penalties

1.   Section 6664(c)(1):  Reasonable Cause

No penalty is imposed under section 6662 if the taxpayer had reasonable cause for the underpayment of tax and acted in good faith.  Sec. 6664(c)(1).  "The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances."  Sec. 1.6664-4(b)(1), Income Tax Regs.  The extent of the taxpayer's efforts to ascertain his proper tax liability is generally the most important factor.  Id.

a.   Reliance on the Hoyt Organization

Good faith reliance on professional advice concerning tax laws may be a defense to negligence penalties.  United States v. Boyle, 469 U.S. 241, 250-251 (1985); see also sec. 1.6664-4(b)(1), Income Tax Regs.  However, "Reliance on professional advice, standing alone, is not an absolute defense to negligence, but rather a factor to be considered."  Freytag v. Commissioner,

89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991). To be considered a defense to negligence, the taxpayer's reliance must be reasonable. Id. To be objectively reasonable, the advice generally must be from competent and independent parties unburdened with an inherent conflict of interest, not from the promoters of the investment. Mortensen v. Commissioner, 440 F.3d 375, 387 (6th Cir. 2006), affg. T.C. Memo. 2004-279; Van Scoten v. Commissioner, 439 F.3d 1243, 1253 (10th Cir. 2006), affg. T.C. Memo. 2004-275; Goldman v. Commissioner, 39 F.3d 402, 408 (2d Cir. 1994), affg. T.C. Memo. 1993-480; LaVerne v. Commissioner, 94 T.C. at 652; Rybak v. Commissioner, 91 T.C. 524, 565 (1988); Hansen v. Commissioner, T.C. Memo. 2004-269.

Petitioner argues that he reasonably and in good faith relied on Hoyt as an enrolled agent, on Laguna to prepare his returns, and on "Hoyt's outside advisors." Petitioner places strong emphasis on Hoyt's status as an enrolled agent. However, any significance that such status may have is clearly outweighed by the fact that Hoyt was the creator and promoter of the investment scheme. Petitioner's reliance on Hoyt and his organization, including Laguna, was not objectively reasonable because Hoyt and his organization created and promoted the investment, they completed petitioner's tax returns, and they received 75 percent of the refunds petitioner received.

Petitioner argues:

> Hoyt made certain that Petitioner was aware of outside
> counsel by referencing outside counsel in newsletters
> and other documents * * *. Hoyt made certain that
> Petitioner (and other Hoyt investors) were aware that
> Mr. MacDonald and Mr. Dismukes were the attorneys who
> had won Bales * * *. In light of Petitioner's lack of
> sophistication, his reliance on the tax professionals
> that won the Bales case is even more understandable.
> Therefore, the negligence penalty is also inappropriate
> due to Petitioner['s] reasonable reliance on the Hoyt
> outside advisors.

Whether or not petitioner was aware that Hoyt had "outside advisors", there is no evidence that petitioner sought or received advice directly from these "outside advisors". The advisors were hired by Hoyt, and any advice that petitioner may have received from them was filtered through Hoyt.

Petitioner testified that he did not seek advice from tax attorneys or accountants outside of the Hoyt organization. Petitioner's reliance on Hoyt, Laguna, and persons hired by Hoyt, coupled with his failure to seek independent advice, was unreasonable.

### b. Honest Misunderstanding of Fact

Reasonable cause and good faith under section 6664(c) may be indicated where there is "an honest misunderstanding of fact or law that is reasonable in light of all the facts and circumstances, including the experience, knowledge and education of the taxpayer." Sec. 1.6664-4(b)(1), Income Tax Regs. However, "reasonable cause and good faith is not necessarily

indicated by reliance on facts that, unknown to the taxpayer, are incorrect." Id.

Petitioner argues that he had reasonable cause for his underpayments of tax because he was defrauded by Hoyt and therefore made an "honest mistake of fact". He asserts that he had insufficient information concerning his investment, and that all "available independent evidence * * * supported Hoyt's assertions." However, petitioner testified that he relied exclusively on the assertions made by Hoyt, members of the Hoyt organization, and other Hoyt investors. There is no indication that petitioner attempted to verify any of the information he was given. He did not seek an outside opinion from an investment advisor, tax attorney, or accountant. Petitioner's argument that he had insufficient information, while at the same time admitting he made no attempt to get additional information, is not persuasive. If petitioner misunderstood the facts surrounding his investment, it was not an honest misunderstanding but a negligent one.

        c.   Reliance on the Bales Opinion

Petitioner argues he had reasonable cause for his underpayments of tax because he relied on this Court's opinion in Bales v. Commissioner, T.C. Memo. 1989-568.[9] Bales involved

---

[9] Petitioner also argues that the opinion in Bales v. Commissioner, T.C. Memo. 1989-568, provided substantial authority
                                      (continued...)

deficiencies determined against various investors in several Hoyt partnerships.  This Court found in favor of the investors on several issues, stating that "the transaction in issue should be respected for Federal income tax purposes."  <u>Bales</u> involved different investors and different taxable years from the present case.  It also involved different underlying deductions; namely, partnership deductions as opposed to Schedule F deductions.

Despite the differences between <u>Bales</u> and the present case, petitioner argues that he relied on the <u>Bales</u> opinion in claiming his Schedule F deductions.  However, petitioner's testimony on direct examination is illuminating:

> [<u>Bales</u>] was a court case.  There was a--and I'm not familiar with these type of documents, but in the left-hand margin it had all these numbers in it, and it was from the Supreme Court in California, Judge Divens, I believe, was the name.  I actually didn't go through the entire transcript.  It was hard for me to follow there, since I'm not a lawyer.  But I read the abstract that Hoyt provided with that that they sent out in a newsletter where they--and they had highlighted that the judge said that it was a legitimate business.

First, <u>Bales</u> was not decided by a Judge Divens of the Supreme Court of California, but was decided by Judge Scott of the United

---

⁹(...continued)
for the positions taken on his return, thus relieving him from liability from any penalty under sec. 6662(b)(2) and (d).  See sec. 6662(d)(2)(B)(i).  Because we find that petitioner's underpayments were the result of negligence and therefore do not address whether the underpayments were also attributable to substantial understatements of tax, we need not consider whether <u>Bales</u> is substantial authority for purposes of sec. 6662(d)(2)(B)(i).

States Tax Court, adopting the opinion of Special Trial Judge Dinan.  Second, and more importantly, petitioner admits that he did not read the entire case, nor did he understand it.  Instead, he relied on the interpretation provided by Hoyt.  We have already found that petitioner's reliance on Hoyt and his organization was unreasonable.  Likewise, accepting Hoyt's assurances that Bales was a wholesale affirmation of the legitimacy of his organization was also unreasonable.

Petitioner also argues that, because this Court was unable to uncover the fraud or deception by Hoyt in Bales, petitioner, as an individual taxpayer, an "unsophisticated investor", and a person of "modest income", was in no position to evaluate the legitimacy of his investment or the tax benefits claimed with respect thereto.  As previously noted by this Court:

> This argument employs the Bales case as a red herring:
> The Bales case involved different investors, different
> partnerships, different taxable years, and different
> issues.  Furthermore, adopting petitioners' position
> would imply that taxpayers should have been given carte
> blanche to invest in partnerships promoted by Mr. Hoyt,
> merely because Mr. Hoyt had previously engaged in
> activities which withstood one type of challenge by the
> Commissioner, no matter how illegitimate the
> partnerships had become or how unreasonable the
> taxpayers were in making investments therein and
> claiming the tax benefits that Mr. Hoyt promised would
> ensue.

Hansen v. Commissioner, T.C. Memo. 2004-269; see also Mortensen v. Commissioner, 440 F.3d at 390-391; Van Scoten v. Commissioner,

439 F.3d at 1254-1256; <u>Sanders v. Commissioner</u>, T.C. Memo. 2005-163.  Petitioner's reliance on <u>Bales</u> was unreasonable.

On the basis of the above, we conclude that petitioner did not have reasonable cause for his underpayments of tax.

### 2. <u>Judicial Estoppel</u>

In general terms, petitioner asks the Court to "apply the doctrine of judicial estoppel to facts Respondent has asserted in previous litigation."  Petitioner does not elaborate.  Presumably, petitioner is arguing that because the U.S. Government successfully prosecuted Hoyt for fraud, respondent is somehow judicially estopped from asserting an accuracy-related penalty against petitioner.

The doctrine of judicial estoppel prevents a party from asserting a claim in a legal proceeding that is inconsistent with a position successfully taken by that party in a previous proceeding.  <u>New Hampshire v. Maine</u>, 532 U.S. 742, 749 (2001).  Among the requirements for judicial estoppel to be invoked, a party's current litigating position must be "clearly inconsistent" with a prior litigating position.  <u>Id.</u> at 750-751.

Respondent's position in asserting an accuracy-related penalty against petitioner is in no manner inconsistent with the position taken by the United States in the criminal conviction of Hoyt.  See, e.g., <u>Goldman v. Commissioner</u>, 39 F.3d at 408 (taxpayer-appellants' argument that an investment partnership

"constituted a fraud on the IRS, as found by a civil jury * * * and by the tax court * * * cannot justify appellants' own failure to exercise reasonable care in claiming the losses derived from their investment"); see also Mortensen v. Commissioner, 440 F.3d 375 (6th Cir. 2006); Van Scoten v. Commissioner, 439 F.3d 1243 (10th Cir. 2006); Hansen v. Commissioner, supra.  Other than his vague assertions, petitioner has failed to identify any clear inconsistencies between respondent's current position and his position in any previous litigation.  We conclude that there are no grounds for judicial estoppel in the present case.

3.   Fairness Considerations

Petitioner argues that the application of accuracy-related penalties would be unfair or unjust because such an application does not comport with the underlying purpose of the penalties. Petitioner states:

> Here, the problem was not Petitioner's disregard of the tax laws, but was Jay Hoyt's fraud and deception. Petitioner did not engage in noncompliant behavior, instead, he was the victim of a complex fraud that it took Respondent years to unravel completely.
>
> Petitioner made a good faith effort to comply with the tax laws and punishing him by imposing penalties does not encourage voluntary compliance, but instead has the opposite effect of the appearance of unfairness by punishing the victim.  Indeed, penalties are improper for any investor in the Hoyt partnerships on a policy basis alone.  [Fn. ref. omitted.]

We are mindful of the fact that Hoyt was convicted for his fraudulent actions.  We also recognize that petitioner remitted

the bulk of his refunds to the Hoyt organization. However, this does not alter our conclusion that petitioner was negligent with respect to entering into the investment, and he was negligent with respect to the positions taken on his returns. Despite Hoyt's actions, the positions taken on the 1994 and 1995 returns, signed by petitioner, were ultimately the positions of petitioner.

G. Conclusion

Petitioner's underpayments of tax for 1994 and 1995 were the result of petitioner's negligence, and portions of those underpayments were attributable to gross valuation misstatements. Petitioner did not have reasonable cause for the underpayments. Likewise, petitioner's arguments regarding judicial estoppel and fairness do not absolve him from liability for the accuracy-related penalties. Therefore, we hold that petitioner is liable for 40-percent accuracy-related penalties under section 6662(h) on his underpayments attributable to gross valuation misstatments, so long as the total of those underpayments exceeds $5,000. On his underpayments not subject to penalties under section 6662(h), we hold that petitioner is liable for 20-percent accuracy-related penalties under section 6662(a) and (b)(1).

To reflect the foregoing and the concessions of the parties,

<u>Decision will be entered</u>

<u>under Rule 155</u>.