T.C. Memo. 2020-41

UNITED STATES TAX COURT

RODERICK M. CAMPBELL AND C. SANDRA CAMPBELL, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 30224-12.                                      Filed April 7, 2020.

<u>Steven R. Mather</u>, for petitioners.

<u>Michael W. Berwind</u> and <u>Christopher J. Richmond</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

ASHFORD, <u>Judge</u>: By statutory notice of deficiency dated September 12,

2012, respondent determined a deficiency in petitioners' Federal income tax of

[*2] $286,949 and accuracy-related penalties pursuant to section 6662(a) and (h)[1] of $45,935 and $22,910, respectively, for the 2008 taxable year.

After concessions,[2] the issues remaining for decision are whether petitioners (1) are entitled to a carryover charitable contribution deduction with respect to a 2007 donation of 3,432 new designer eyeglass frames to Lions in Sight of California and Nevada (Lions in Sight) and (2) are liable for section 6662(a) and (h) accuracy-related penalties.[3] We resolve the first issue in favor of respondent and the second issue in favor of petitioners.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference.

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. Some monetary amounts are rounded to the nearest dollar.

[2]The notice of deficiency in pertinent part adjusted (1) petitioners' reported loss on their Schedule E, Supplemental Income and Loss, by $704,682 and (2) petitioners' reported net operating loss carryforward by $1,019,896. The parties now agree that the correct Schedule E adjustment and the correct net operating loss carryforward adjustment should be $493,277 and $713,927, respectively.

[3]The sec. 6662(a) penalty applies to petitioners' Schedule E loss and net operating loss carryforward. The sec. 6662(h) penalty applies to their carryover charitable contribution deduction.

**[*3]** Petitioners resided in California when their petition was timely filed with the Court.

I.    Petitioners' Participation in an Eyewear Charitable Contribution Program

In December 2006 Mr. Campbell learned of an eyewear charitable contribution program through certified public accountant Victor Kawana, a one-third owner (and at the time of trial the managing partner) of Kruse Mennillo, LLP (Kruse Mennillo), an accounting and management consulting firm with offices in Cerritos, California, and Kansas City, Missouri.  Since approximately 2000 Kruse Mennillo had been providing accounting, estate planning, and return preparation services to petitioners.  This eyewear charitable contribution program involved ZD Products, Inc. (ZD Products), consolidating over 170,000 designer eyeglass frames it possessed into units of approximately 3,432 frames each and selling these units to 50 buyers for $50,000 per unit; each buyer would then purportedly be eligible to donate his or her frames after a minimum one-year holding period to Lions in Sight, a section 501(c)(3) nonprofit organization[4] (or to a different qualified charitable organization of the buyer's choosing), and claim a charitable

---

[4]Lions in Sight is affiliated with the Lions Club International, a community service organization; its mission is to promote the collection of used eyeglasses from the general public for recycling and use worldwide and to provide no-cost eye care assistance to needy and low-income individuals.

[*4] contribution deduction at the appraised fair market value at the time of donation. As discussed below, Mr. Campbell received a copy of an offering memorandum dated November 30, 2006, detailing the program and its tax implications, along with other documents that the offering memorandum referenced.

The offering memorandum was prepared by Mr. Kawana (and two other Kruse Mennillo partners) at ZD Products' request.[5] It recited that ZD Products (1) was in possession of 171,600 designer eyeglass frames and (2) "will sell allotments of approximately 3,432 units to 50 prospective buyers for $50,000 per unit", and that "[q]ualified individuals, if desired, are eligible to donate the frames to qualified charities at fair market value, $225,322 after a one-year holding period", thus becoming eligible for a tax deduction at appraised fair market value. It also recited that, if desired, ZD Products "will take care of all arrangements regarding storage of the frames for the necessary time period, insurance at cost basis, drop shipment to a qualified charity, and completion of IRS form 8283 signed by a qualified appraiser to be attached to purchaser's income tax return [for] the year of deduction." According to the offering memorandum the purchaser would be allowed to inspect or remove his or her unit at any time.

---

[5]The president of ZD Products was also listed on the offering memorandum.

[*5] Furthermore, although there was no restriction on the use or disposition of the purchaser's unit during the one-year holding period, the offering memorandum identified Lions in Sight as the targeted donee and explained why, including indicating that ZD Products had already made arrangements with Lions in Sight to ship the frames to it.

The offering memorandum also stated that ZD Products had retained Marshall & Stevens, Inc. (Marshall & Stevens), a Los Angeles, California-based valuation consulting firm, to make an analysis and valuation of the frames on the basis of "the assumption of a donee contributing the property for the function of an income tax deduction."[6]  Additionally, the offering memorandum stated that Marshall & Stevens would conduct a followup appraisal at the time of the donation, provide and sign a Form 8283, Noncash Charitable Contributions, and defend its appraisal if challenged by the Internal Revenue Service (IRS).

The initial written appraisal prepared by Marshall & Stevens and dated November 27, 2006 (2006 Marshall & Stevens appraisal), was included with the offering memorandum.  The 2006 Marshall & Stevens appraisal described the

---

[6]We note that the offering memorandum incorrectly refers to "donee" here when instead the reference should be "purchaser" or "donor".

**[\*6]** property that ZD Products requested it value and the property's physical condition as follows:

> **1.3    Description of the Donated Property**
> The property to be contributed consists of new (unused) Designer Eyewear Products ("Designer Eyewear Products" or "donated property").  The subject property list with description, count and wholesale price originated from Eyewear Designs LTD.  Located in Syosset NY.  The subject property consists of various styles and designer brand names.  These designer brand names include Bill Blass, Elizabeth Arden, Perry Ellis, and Pierre Cardin.  The total quantity is 171,600.  A sampling of the various brand names and models show that the eyewear brands are still active in the marketplace.  These particular designer eyewear product brand names are some of the most well known and long standing eyewear products in the designer eyewear marketplace.  They have however have [sic] been discounted over time and are no longer the most current popular styles and brands.
>
> **1.4    Physical Condition of the Property**
> We have not made a personal viewing of the subject property.  It is our understanding that the subject property analyzed is in new (unused) condition and that the amount of property or "count" is correct.  The current location of the subject property is not known.

The referenced "subject property list" (which was attached to the 2006 Marshall & Stevens appraisal) stated that the "donated property" consisted of 31,950 Bill Blass frames, 23,150 Elizabeth Arden frames, 13,200 Elizabeth Arden "Petites" frames, 33,150 Pierre Cardin frames, 54,350 Perry Ellis frames, and 15,800 Perry Ellis America frames.  This list also showed various models within each eyewear brand of varying quantities and wholesale prices.  The wholesale price per model

[*7] ranged from $37 to $80.  Using the market approach[7] and on the basis of the wholesale prices with a markup of 35%, Marshall & Stevens opined that the fair market value of the "donated property" as of November 27, 2006, was $11,266,115.

Mr. Campbell decided to participate in the eyewear charitable contribution program.  As memorialized by a bill of sale dated December 22, 2006, Mr. Campbell purchased for $50,000 "an inventory of Prescription Designer Eyewear" from ZD Products.  The bill of sale stated that an "[i]temized inventory by brand name, style, and quantity is attached", and that he had "an unrestricted and unfettered interest in the merchandise attached", although no such inventory or merchandise list was attached.  The parties also stipulated that Mr. Campbell agreed to purchase "a single allotment of approximately 3,432 eyewear frames from ZD Products".  Pursuant to the offering memorandum ZD Products stored Mr. Campbell's frames on his behalf.

Mr. Kawana also participated in the eyewear charitable contribution program (and claimed a deduction for donating his frames) despite his role in

---

[7]In any valuation there are generally three approaches to value--the income approach, the market approach, and the cost approach.  See Bank One Corp. v. Commissioner, 120 T.C. 174, 306 (2003) (discussing each approach), aff'd in part, vacated in part, and remanded on another issue sub nom. JPMorgan Chase & Co. v. Commissioner, 458 F.3d 564 (7th Cir. 2006).

[*8] advising ZD Products with respect to the program and promoting the program to Mr. Campbell (and others).

At a time in 2007 not established by the record, ZD Products came into possession of additional new designer eyeglass frames for the eyewear charitable contribution program. As of December 2007 more than 340,000 frames were available for donation to Lions in Sight. To that end, in December 2007 Dr. William Iannaccone, the chief operating officer of Lions in Sight, was contacted about receiving the more than 340,000 frames as a donation. Dr. Iannaccone agreed to accept the donation, but because of Lions in Sight's warehouse constraints ZD Products stored the frames on Lions in Sight's behalf until April 29, 2008, when they were delivered to Lions in Sight's warehouse.

On December 28, 2007, Lions in Sight sent Mr. Campbell a letter acknowledging his "generous gift of prescription eye ware [sic]" and how his donation would assist Lions in Sight. The letter was signed by Dr. Iannaccone. The letter made no mention as to whether Lions in Sight provided any goods or services in consideration for his donation.

Pursuant to the offering memorandum Marshall & Stevens prepared a followup written appraisal for ZD Products; this appraisal was dated December 26, 2007, and certified by Senior Manager Shane Park at Marshall & Stevens (2007

**[*9]** Marshall & Stevens appraisal).  The 2007 Marshall & Stevens appraisal contained the same description and physical condition of the "donated property" as the 2006 Marshall & Stevens appraisal except that the total quantity of eyeglass frames had increased to 349,629 (from 171,600) and included the following additional brand names--Laura Ashley, Eddie Bauer, HSM, Nicole Miller, Dakota Smith, and Bebe.

The inventory list attached to the 2007 Marshall & Stevens appraisal stated that the "donated property" consisted of the same quantity and frame models as the inventory list attached to the 2006 Marshall & Stevens appraisal plus 84,847 Laura Ashley frames, 38,923 Eddie Bauer frames, 583 HSM frames, 6,044 Nicole Miller frames, 1,047 Signature Collection frames,[8] 43,411 Dakota Smith frames, and 3,174 Bebe frames.  This list also showed various models within each eyewear brand of varying quantities and wholesale prices.  Like the inventory list attached to the 2006 Marshall & Stevens appraisal, the wholesale price per model ranged from $37 to $80.  Using the market approach and on the basis of the wholesale prices with a markup of 35%, Marshall & Stevens opined that the fair market value of the "donated property" as of December 26, 2007, was $24,019,826.

---

[8]This brand was not mentioned in the "Description of Donated Property" section of the 2007 Marshall & Stevens appraisal.

[*10] On April 9, 2008, Marshall & Stevens sent petitioners a letter stating that it had "made an analysis and valuation of the Fair Market Value of Designer Eyewear Products" and that "as a result of our analysis, we have determined that the Fair Market Value of the Designer Eyewear Products you hold is $225,596 based on" the 2007 Marshall & Stevens appraisal. The 2007 Marshall & Stevens appraisal was attached to the letter.

## II.   Petitioners' Tax Reporting

### A.   2007 Return

Petitioners prepared and timely filed (with the assistance of Kruse Mennillo) their joint Form 1040, U.S. Individual Income Tax Return, for 2007 (2007 return). On the 2007 return they reported adjusted gross income of –$1,016,964, consisting of taxable interest of $5,696, ordinary dividends of $236, a capital loss of $3,000, a Schedule E loss of $114,861, a net operating loss carryforward of $897,680, and self-employment tax of $7,355. As relevant here, they attached to the 2007 return a Schedule A, Itemized Deductions, claiming $97,621 of itemized deductions. On this Schedule A petitioners reported, among other items, the purported $225,596 donation to Lions in Sight (along with charitable gifts by cash or check of $39,435 and a charitable contribution carryover from a prior year of $15,645), but because of petitioners' negative adjusted gross income they could

**[*11]** not claim a charitable contribution deduction as an itemized deduction for 2007.  As discussed <u>infra</u> p. 12, petitioners claimed this deduction as a carryover deduction on their Schedule A for 2008.

Further information regarding the Lions in Sight donation was shown on a Form 8283, which they also attached to the 2007 return.[9]  Section B of the form, captioned "Donated Property Over $5,000 (Except Certain Publicly Traded Securities)", has four parts.  Part I, captioned "Information on Donated Property", indicated that petitioners donated "eyeglass frames" in "new" condition having an appraised fair market value of $225,596, which they had purchased in December 2006 for $50,000.  Part III, captioned "Declaration of Appraiser", bore a signature, albeit illegible, of a "principal" at Marshall & Stevens dated December 26, 2007, and showed Marshall & Stevens' address in Los Angeles, California, and a Federal tax identification number.[10]  Part IV, captioned "Donee Acknowledgment", indicated that Lions in Sight (1) is a qualified organization under section 170(c), (2) received the donated property described in Part I on December 28, 2007, and (3) does not intend to use the property for an unrelated

---

[9]The record does not include page one of this form which requests information on donated property of $5,000 or less and publicly traded securities.

[10]Part II is not relevant here.

[*12] use.  This part also bore the signature of Dr. Iannaccone (along with his title) dated April 14, 2008, and showed Lions in Sight's address in Walnut Creek, California, and its employer identification number.

In addition to attaching this form to the 2007 return petitioners attached Marshall & Stevens' April 9, 2008, letter to them and the 2007 Marshall & Stevens appraisal.

B.    2008 Return

Petitioners prepared and timely filed (not with the assistance of Kruse Mennillo but of another paid preparer) their joint Form 1040 for 2008 (2008 return).  On the 2008 return they reported adjusted gross income of $2,968,330, consisting of wages of $39,000 (attributable to Mr. Campbell's employment as an executive consultant with RWB Automotive, LLC), taxable interest of $57,405, ordinary dividends of $2,601, a capital gain of $4,354,602, a Schedule E loss of $495,205, taxable Social Security benefits of $29,823, and a net operating loss carryforward of $1,019,896.  As relevant here and like the 2007 return, petitioners attached to the 2008 return a Schedule A.  On this Schedule A they claimed $837,577 of itemized deductions, consisting of, among other items, the carryover charitable contribution deduction from the 2007 return (which included the Lions in Sight donation).

**[*13]** III.    Postcontribution Appraisal

A retrospective appraisal of the 349,629 eyeglass frames was performed by Leslie Miles of Miles Appraisals; this appraisal was dated February 24, 2012 (2012 Miles appraisal).[11]  In opining as to the fair market value of these frames, Mr. Miles reviewed the 2007 Marshall & Stevens appraisal.  Mr. Miles did not sample or inspect the frames because of the retrospective nature of the assignment, and his analysis revealed that 39,709 frames "were not matched [(i.e., not current in the marketplace)] and, therefore, not included in the valuation except at a zero amount."  Additionally, at trial Mr. Miles stated that he did not know who owned the frames that he valued, nor whether the frames Mr. Campbell had donated to Lions in Sight were part of what he valued.  Using the market approach and on the basis of the wholesale price with a markup of 35% and deducting 15% for costs associated with handling and restocking the frames, Mr. Miles opined that the fair market value of the 349,629 eyeglass frames as of December 26, 2007, was $12,861,750.

---

[11]This appraisal is inexplicably addressed to "Nathan Hochman", and in the appraisal he is referred to as the "client".

[*14] IV.   Notice of Deficiency

Following an examination of the 2008 return, respondent determined in pertinent part that petitioners' carryover charitable contribution deduction with respect to Mr. Campbell's Lions in Sight donation should be disallowed and that accuracy-related penalties should be imposed.  The notice of deficiency mailed to petitioners on September 12, 2012, reflects those determinations.  A Civil Penalty Approval Form prepared by the examining agent on June 10, 2011, listed 2008 (as well as 2007) and bore a signature on the line provided on the form for "Group Manager Approval to Assess Penalties Identified Above" dated July 12, 2011, approving that a "[p]enalty will be asserted with the 2008 Year."[12]  The record does not include any other evidence of penalty approval for 2008.

OPINION

I.   Burden of Proof

In general, the Commissioner's determinations set forth in a notice of deficiency are presumed correct and, except for the burden of production in any court proceeding with respect to an individual taxpayer's liability for any "penalty, addition to tax, or additional amount", see sec. 7491(c), the taxpayer bears the

---

[12]The parties have stipulated that the signature (i.e., initials) is that of the immediate supervisor of the examining agent.

[*15] burden of proving otherwise, see Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Furthermore, tax deductions are a matter of legislative grace, and the taxpayer bears the burden of proving entitlement to any deduction claimed. Segel v. Commissioner, 89 T.C. 816, 842 (1987). This burden requires the taxpayer to demonstrate that the claimed deduction is allowable pursuant to some statutory provision and to substantiate the item giving rise to the claimed deduction.[13] Sec. 6001; Higbee v. Commissioner, 116 T.C. 438, 440 (2001); Hradesky v. Commissioner, 65 T.C. 87, 89-90 (1975), aff'd per curiam, 540 F.2d 821 (5th Cir. 1976).

II.    Charitable Contributions

    A.    Applicable Law

A taxpayer is allowed as a deduction any charitable contribution made during the taxable year. Sec. 170(a)(1). A charitable contribution is defined as "a contribution or gift to or for the use of" a charitable organization. Sec. 170(c). Such a deduction is allowable "only if verified under regulations prescribed by the

---

[13]By motion petitioners contended that the burden of proof should shift to respondent pursuant to sec. 7491(a). Under sec. 7491(a)(1) and (2), if the taxpayer produces credible evidence with respect to any factual issue relevant to ascertaining his Federal income tax liability and meets certain other requirements, the burden of proof shifts from the taxpayer to the Commissioner as to that factual issue. Immediately before the trial of this case the parties were heard on petitioners' motion and the Court, by order, denied the motion.

[*16] Secretary." Sec. 170(a); see sec. 170A-13, Income Tax Regs. As relevant here, for any noncash charitable contribution exceeding $5,000, the regulations require the donor to (1) obtain a "qualified appraisal" for the property contributed, (2) attach a fully completed "appraisal summary" to the income tax return for the year the deduction is claimed, and (3) maintain records containing certain information (as required by section 1.170A-13(b)(2)(ii), Income Tax Regs.). Sec. 1.170A-13(c)(2), Income Tax Regs.; see also sec. 170(f)(11)(C); Alli v. Commissioner, T.C. Memo. 2014-15, at *19 n.13. Additionally and as relevant here, for any contribution of $250 or more the donor must obtain a "contemporaneous written acknowledgment" (CWA) from the charitable organization. Sec. 1.170A-13(f)(1), Income Tax Regs.; see also sec. 170(f)(8); Oatman v. Commissioner, T.C. Memo. 2017-17, at *13.

B. Parties' Positions

Respondent contends that petitioners are not entitled to their carryover charitable contribution deduction with respect to Mr. Campbell's Lions in Sight donation because (1) the contribution was not made with donative intent, (2) the contribution was not made in 2007 but rather in 2008, and (3) petitioners did not comply with the substantiation requirements under section 170 and the regulations thereunder. Respondent contends that petitioners did not comply with the

[*17] substantiation requirements because (1) the 2007 Marshall & Stevens appraisal was not a "qualified appraisal" and (2) Lions in Sight's December 28, 2007, letter to Mr. Campbell was not a proper CWA.[14]

We need only address whether petitioners have complied with the substantiation requirements under section 170 and the regulations thereunder.

## C.    Section 170 Substantiation

### 1.    Qualified Appraisal

Under the regulations for an appraisal to be a "qualified appraisal" it must (1) be made no earlier than 60 days before the date of the contribution and no later than the due date of the return, (2) be prepared, signed, and dated by a qualified appraiser, (3) not involve a prohibited appraisal fee, and (4) include certain information. Sec. 1.170A-13(c)(3)(i), Income Tax Regs. The information that must be included is the following:

> (A) A description of the property in sufficient detail for a person who is not generally familiar with the type of property to ascertain that the property that was appraised is the property that was (or will be) contributed;
>
> (B) In the case of tangible property, the physical condition of the property;

---

[14]Respondent also contends that the Form 8283 attached to the 2007 return was not a fully completed "appraisal summary". In the light of our holdings as discussed infra, we decline to address this contention.

**[*18]**    (C) The date (or expected date) of contribution to the donee;

(D) The terms of any agreement or understanding entered into (or expected to be entered into) by or on behalf of the donor or donee that relates to the use, sale, or other disposition of the property contributed * * * ;

(E) The name, address, and * * * the identifying number of the qualified appraiser * * * ;

(F) The qualifications of the qualified appraiser who signs the appraisal, including the appraiser's background, experience, education, and membership, if any, in professional appraisal associations;

(G) A statement that the appraisal was prepared for income tax purposes;

(H) The date (or dates) on which the property was appraised;

(I) The appraised fair market value * * * of the property on the date (or expected date) of contribution;

(J) The method of valuation used to determine the fair market value * * * ; and

(K) The specific basis for the valuation * * * .

Id. subdiv. (ii).

Respondent contends that the 2007 Marshall & Stevens appraisal was not a "qualified appraisal" because it failed to satisfy the first requirement of section 1.170A-13(c)(3)(ii), Income Tax Regs. We agree (as further discussed below), but the 2007 Marshall & Stevens appraisal suffers from a more fundamental problem;

[*19] that is, it is not an appraisal of what Mr. Campbell donated, i.e., his 3,432 new designer eyeglass frames, see sec. 1.170A-13(c)(2)(i)(A), Income Tax Regs., but rather is an appraisal premised on valuing 349,629 frames. As we stated in Alli v. Commissioner, at *30, "[i]n order for the qualified appraisal to help the IRS 'deal more effectively with the prevalent use of overvaluations,' the appraised property must be the same property that was donated and that gave rise to the claimed deduction." See also Estate of Evenchik v. Commissioner, T.C. Memo. 2013-34, at *8 (concluding that taxpayers did not obtain a "qualified appraisal" of "the contributed property", consisting of 72% of the shares in a corporation, because the appraisals obtained were appraisals of the corporation's assets and not of the contributed shares); Smith v. Commissioner, T.C. Memo. 2007-368, slip op. at 47-48 (concluding that taxpayers' charitable contribution of fractional interests in a family limited partnership that was supported by an appraisal of the partnership's sole underlying asset, along with their failure to attach a qualified summary appraisal to their return and show that the appraisal was completed by a qualified appraiser, did not "substantially comply or otherwise provide * * * [the Commissioner] with sufficient information to accomplish the statutory purpose" of enabling the Commissioner to "understand and monitor the claimed contributions"), aff'd, 364 F. App'x 317 (9th Cir. 2009).

[*20] Although the 2007 Marshall & Stevens appraisal included Mr. Campbell's 3,432 eyeglass frames, we (and the IRS) have no way to determine whether what he alone contributed is overvalued. This is the type of situation that Congress intended to prevent when it codified more than 15 years ago the requirement that a taxpayer claiming a charitable contribution deduction for the donation of property worth more than $5,000 obtain a qualified appraisal for the property contributed. Sec. 170(f)(11)(C) (as amended by the American Jobs Creation Act of 2004, Pub. L. No. 108-357, sec. 883(a), 118 Stat. at 1631).

Tellingly, the 349,629 eyeglass frames that Marshall & Stevens valued varied in price between $37 and $80, yet petitioners could not discern whether Mr. Campbell's 3,432 frames are from the low end of the price spectrum, the high end, or some varying combination. Indeed, the 2012 Miles appraisal highlights the primary defect of the 2007 Marshall & Stevens appraisal. In the 2012 Miles appraisal, 39,709 of the 349,629 eyeglass frames were assigned a value of zero as of December 2007. Might Mr. Campbell's 3,432 frames been a part of the 39,709 frames?

On brief petitioners argue (via requesting that the Court find as fact) that Mr. Campbell purchased and donated a fractional interest, i.e., an undivided 3,432d interest, in the 349,629 frames. The record unmistakably belies this. As an

**[*21]** initial matter, petitioners have stipulated that Mr. Campbell purchased a single allotment of 3,432 eyeglass frames from ZD Products. We treat a stipulation "as a conclusive admission by the parties, and the Court will not permit a party to change or contradict a stipulation, except in extraordinary circumstances." Kearse v. Commissioner, T.C. Memo. 2019-53, at *15 (quoting Shackelford v. Commissioner, T.C. Memo. 1995-484, slip op. at 15); see also Rule 91(e). We also note that petitioners have not "asked to be relieved [from the binding effect] of this stipulation, and we will therefore hold * * * [them] to it." See Winter v. Commissioner, T.C. Memo. 2010-287, slip op. at 28. Additionally, the offering memorandum does not reflect that prospective buyers will have a fractional interest; instead it recites that prospective buyers will have the opportunity to purchase one or more allotments of 3,432 eyeglass frames from a collection of 171,600 frames in ZD Products' possession. The bill of sale between Mr. Campbell and ZD Products also does not memorialize the purchase of a fractional interest and it references an itemized inventory or merchandise list (although such a list is not attached to the bill of sale). Moreover, if Mr. Campbell indeed had a fractional interest he would not have had the unfettered right as the offering memorandum provided to (1) inspect or remove his frames and (2) donate

**[\*22]** his frames before the one-year holding period even to another charitable organization besides Lions in Sight.

We conclude that the 2007 Marshall & Stevens appraisal does not comply with the requirement in section 1.170A-13(c)(2)(i)(A), Income Tax Regs., that the taxpayer obtain an appraisal of the property <u>he</u> contributed and gave rise to <u>his</u> claimed deduction.

We also agree with respondent, as indicated <u>supra</u> p. 18, that the 2007 Marshall & Stevens appraisal fails to provide "[a] description of the property in sufficient detail for a person who is not generally familiar with the type of property to ascertain that the property that was appraised is the property that was (or will be) contributed". Sec. 1.170A-13(c)(3)(ii)(A), Income Tax Regs. As we stated in <u>Alli v. Commissioner</u>, at \*31-\*32 (quoting <u>Bruzewicz v. United States</u>, 604 F. Supp. 2d 1197, 1206 (N.D. Ill. 2009)), "[t]he description requirement is 'important, indeed essential, to the review of charitable contribution deductions and the reliability of corresponding appraisals.' Indeed, '[a]bsent a description of the \* \* \* [contributed property], the appraisal and its valuation of the donated property are meaningless.'" The 2007 Marshall & Stevens appraisal did not provide a description of the 3,432 eyeglass frames <u>as contributed by Mr.</u>

[*23] <u>Campbell</u>.  Consequently, it does not comply with section 1.170A-13(c)(3)(ii)(A), Income Tax Regs.

Accordingly, we hold that petitioners did not strictly comply with the requirement under section 170 and the regulations thereunder that the taxpayer obtain a "qualified appraisal".

## 2.   CWA

Under the regulations a CWA must include:  (1) the amount of cash and a description (but not value) of any property other than cash contributed; (2) whether the donee organization provided any goods or services in consideration for the contribution; and (3) a description and a good faith estimate of the value of any goods or services provided by the organization, or if such goods and services consist solely of intangible religious benefits, a statement to that effect.[15]  Sec. 1.170A-13(f)(2), Income Tax Regs.

Respondent contends that Lions in Sight's December 28, 2007, letter to Mr. Campbell was not a proper CWA because it did not address the "goods or services" question.  We agree (although we recognize that petitioners claim, and it can be inferred from the record, that Mr. Campbell's Lions in Sight donation was

---

[15]Sec. 170(f)(8)(B) also sets forth this CWA requirement and sec. 170(f)(8)(D) provides an exception to this requirement, but petitioners do not assert that this exception applies.

[*24] not made with the expectation of a quid pro quo). The letter merely acknowledged his "generous gift of prescription eyeware [sic]" and how his contribution would assist Lions in Sight; it made no mention of whether Lions in Sight provided any goods or services in consideration for Mr. Campbell's contribution. As we have stated many times, the CWA must affirmatively state that no consideration was provided for the contributed property regardless of whether a taxpayer actually received any consideration; this is a mandatory requirement and no deduction will be allowed if the CWA does not include such a statement. See, e.g., French v. Commissioner, T.C. Memo. 2016-53, at *8; Crimi v. Commissioner, T.C. Memo. 2013-51, at *92-*93; Durden v. Commissioner, T.C. Memo. 2012-140, slip op. at 7-8; Friedman v. Commissioner, T.C. Memo. 2010-45, slip op. at 14. "The deterrence value of * * * [a total denial of a deduction in the case of an improper CWA] comports with the effective administration of a self-assessment and self-reporting system." Addis v. Commissioner, 374 F.3d 881, 887 (9th Cir. 2004), aff'g 118 T.C. 528 (2002).

Accordingly, we hold that petitioners did not strictly comply with the requirement under section 170 and the regulations thereunder that the taxpayer obtain a CWA.

**[\*25]**       3.       Substantial Compliance

Petitioners contend that to the extent they have not strictly complied with the substantiation requirements of section 170 and the regulations thereunder they should still be entitled to their carryover charitable contribution deduction with respect to Mr. Campbell's Lions in Sight donation because they substantially complied with these requirements. Their argument primarily springs from Bond v. Commissioner, 100 T.C. 32, 40-41 (1993), where we determined that some of the requirements of section 1.170A-13, Income Tax Regs., are "directory and not mandatory", and thus strict compliance with these requirements is not necessary if the taxpayer demonstrates "substantial compliance". In Bond the taxpayers donated two blimps to a charitable organization. Id. at 33. They hired an appraiser, who timely made an appraisal of the blimps for use by the taxpayers in the preparation of their Federal income tax return for 1986. Id. The appraiser prepared an "appraisal summary" (i.e., a Form 8283), which the taxpayers attached to their 1986 return on which they claimed a charitable contribution deduction of $60,000 (the appraised value) for the donated blimps. Id. at 34. The taxpayers, however, did not attach to this return a "qualified appraisal" of the blimps. Id. At the beginning of the audit of their 1986 return, the appraiser furnished a letter stating his qualifications and explaining how he appraised the blimps. Id. at 34-

[*26] 35.  We held that the taxpayers had substantially complied with section 1.170A-13, Income Tax Regs., and thus were entitled to the charitable contribution claimed because:

> [The taxpayers] * * * met all of the elements required to establish the substance or essence of a charitable contribution, but merely failed to obtain and attach to their return a separate written appraisal * * * even though substantially all of the specified information except the qualifications of the appraiser appeared in the Form 8283 attached to the return.  The denial of a charitable deduction under these circumstances would constitute a sanction which is not warranted or justified.  [Id. at 42.]

Substantial compliance is not intended to excuse all failures but rather it may be applied where "the taxpayers had provided most of the information required[] and the single defect in furnishing everything required was not significant" or made omissions "solely through inadvertence."  Hewitt v. Commissioner, 109 T.C. 258, 265 & n.10 (1997), aff'd without published opinion, 166 F.3d 332 (4th Cir. 1998); see also Durden v. Commissioner, slip op. at 5 ("The doctrine of substantial compliance is designed to avoid hardship in cases where a taxpayer does all that is reasonably possible, but nonetheless fails to comply with the specific requirements of a provision.").  Consequently, the substantial compliance doctrine is not to be liberally applied.  Alli v. Commissioner, at *54 (and cases cited threat).  Indeed, as we highlighted in

[*27] <u>Estate of Evenchik v. Commissioner</u>, at *11-*12, and <u>Mohamed v.</u> <u>Commissioner</u>, T.C. Memo. 2012-152, slip op. at 19, few taxpayers post-<u>Bond</u> have succeeded in showing substantial compliance with the requirements of section 170 and the regulations thereunder.

Petitioners suffer the same fate. A taxpayer cannot be excused from strict compliance where the taxpayer fails to meet an essential requirement of section 170 or a substantive requirement of the regulations thereunder. <u>See, e.g.</u>, <u>Estate of</u> <u>Clause v. Commissioner</u>, 122 T.C. 115, 122 (2004); <u>Alli v. Commissioner</u>, at *55 (and cases cited threat); <u>Friedman v. Commissioner</u>, slip op. at 6. Regarding the 2007 Marshall & Stevens appraisal, as discussed <u>supra</u> pp. 20-23, its defects are not (in the words of petitioners) "ridiculously trivial and inconsequential". The 2007 Marshall & Stevens appraisal was not an appraisal of Mr. Campbell's contributed property, i.e., his 3,432 new designer eyeglass frames; instead it valued 349,629 frames. The appraisal also failed to meet the description requirement set forth in section 1.170A-13(c)(3)(ii)(A), Income Tax Regs. These "miscue[s] go[] to the essence of the information required". <u>Evenchik v.</u> <u>Commissioner</u>, at *14. Consequently, the 2007 Marshall & Stevens appraisal does not substantially comply with the requirements of section 170 and the regulations thereunder. Regarding Lions in Sight's December 28, 2007, letter to Mr.

**[\*28]** Campbell and whether it substantially complied with the requirements under section 170 and the regulations thereunder for a CWA, we have held on numerous occasions that the doctrine of substantial compliance does not apply with respect to the CWA requirements.  See Izen v. Commissioner, 148 T.C. 71, 76-77 (2017) (and cases cited threat).

        4.     Reasonable Cause

Petitioners also contend that pursuant to section 170(f)(11)(A)(ii)(II) reasonable cause exists because they "relied on the advice of their long-term accountants [i.e., Kruse Mennillo] that the documentation relating to the charitable contribution met the requirements" of section 170 and the regulations thereunder.

As relevant here, if a taxpayer does not strictly or substantially comply with the requirement of section 170 and the regulations thereunder that he obtain a "qualified appraisal", section 170(f)(11)(A)(ii)(II) provides that a charitable contribution deduction will not be denied if the taxpayer can prove that the failure to meet this requirement "is due to reasonable cause and not to willful neglect."[16] We use other Code provisions' reasonable cause standards to interpret the section

---

[16]We note that this reasonable cause exception does not apply to the requirement of sec. 170 and the regulations thereunder that the taxpayer obtain a CWA.  See sec. 170(f)(11)(A)(i).  Thus, there is no reasonable cause to absolve petitioners' failure to comply with the CWA requirement.

**[*29]** 170(f)(11)(A)(ii)(II) reasonable cause standard. See Crimi v. Commissioner, at *98-*99.

"Reasonable cause requires that the taxpayer have exercised ordinary business care and prudence as to the challenged item. Thus, the inquiry is inherently a fact-intensive one, and facts and circumstances must be judged on a case-by-case basis." Id. at *99 (citing United States v. Boyle, 469 U.S. 241 (1985)). Reliance on the advice of a professional, such as a certified public accountant, would constitute reasonable cause and good faith if the taxpayer proves by a preponderance of the evidence that he: (1) reasonably believed the professional was a competent tax adviser with sufficient expertise to justify reliance, (2) provided necessary and accurate information to the advising professional, and (3) actually relied in good faith on the professional's advice. Id.; see also Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002). However, a taxpayer cannot rely on the advice of a professional where that advice is not "from a competent and independent advisor unburdened with a conflict of interest and not from promoters of the investment." 106 Ltd. v. Commissioner, 136 T.C. 67, 79 (2011) (quoting Mortensen v. Commissioner, 440 F.3d 375, 387 (6th Cir. 2006), aff'g T.C. Memo. 2004-279), aff'd, 684 F.3d 84 (D.C. Cir. 2012); see also Mazzei v. Commissioner,

**[\*30]** 150 T.C. 138, 181 (2018) (citing Neonatology Assocs., P.A. v. Commissioner, 115 T.C. at 98).

Mr. Campbell learned of the eyewear charitable contribution program through Mr. Kawana at Kruse Mennillo (who petitioners had engaged to provide accounting, estate planning, and return preparation services to them since approximately 2000). Mr. Kawana and two other Kruse Mennillo partners served as advisers to ZD Products with respect to the program (having prepared the offering memorandum), and Mr. Kawana personally participated in the program. As we stated in 106 Ltd. v. Commissioner, 136 T.C. at 79, "[t]he caselaw is clear on this point--promoters take the good-faith out of good-faith reliance." On the basis of the record before us, we find that Mr. Kawana and Kruse Mennillo were promoters of the program and not "independent advisor[s] unburdened with a conflict of interest". Id. Accordingly, petitioners' reasonable cause argument is meritless.[17]

---

[17]Petitioners also argue that respondent did not submit any facts that would negate the existence of reasonable cause. Petitioners, however, bear the burden of proving reasonable cause, see Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001), and they have failed to present evidence of such.

**[\*31]** We sustain respondent's determination that petitioners are not entitled to their carryover charitable contribution deduction with respect to Mr. Campbell's Lions in Sight donation.

III.     Accuracy-Related Penalties

We now address whether petitioners are liable for the section 6662(a) and (h) accuracy-related penalties.

As indicated supra pp. 14-15, the Commissioner bears the burden of production with respect to an individual taxpayer's liability for any penalty.  Sec. 7491(c).  In Frost v. Commissioner, 154 T.C. ___, ___ (slip op. at 20) (Jan. 7, 2020), we recently held that the Commissioner's initial burden of production under section 7491(c) includes producing evidence that he has complied with the procedural requirements of section 6751(b) and that once he has satisfied this initial burden the taxpayer must come forward with contrary evidence.  Section 6751(b)(1) requires that the initial determination of certain penalties be "personally approved (in writing) by the immediate supervisor of the individual making such determination".  See Graev v. Commissioner, 149 T.C. 485, 492-493 (2017), supplementing and overruling in part 147 T.C. 460 (2016); see also Clay v. Commissioner, 152 T.C. 223, 248 (2019) (quoting section 6751(b)(1)).  In Belair Woods, LLC v. Commissioner, 154 T.C. ___, ___ (slip op. at 24-25)

**[\*32]** (Jan. 6, 2020), we recently held that "the 'initial determination' of a penalty assessment * * * is embodied in the document by which the Examination Division formally notifies the taxpayer, in writing, that it has completed its work and made an unequivocal decision to assert penalties." Furthermore and as relevant here, in Palmolive Bldg. Inv'rs, LLC v. Commissioner, 152 T.C. 75, 87 (2019), we recently held that the section 6662(a) and (h) penalties are distinct (despite the title of section 6662 referring to a (singular) penalty), and the initial determination under each subsection must be separately approved for purposes of section 6751(b)(1). See also Rogers v. Commissioner, T.C. Memo. 2019-61, at \*20 (citing Palmolive Bldg. Inv'rs, LLC v. Commissioner, 152 T.C. at 87).

On the basis of the record before us, we hold that respondent has failed to carry his initial burden of production under section 7491(c) to show that he complied with the procedural requirements of section 6751(b). The Civil Penalty Approval Form, although properly signed and dated before the issuance of the notice of deficiency (the first formal communication of penalties to petitioners), does not show separate approval for the section 6662(a) and (h) penalties. The one-page form fails to state with any degree of specificity which penalties should be asserted (and are approved); indeed, all that the form states is that a "[p]enalty will be asserted with the 2008 [y]ear." Section 6751(b)(1) would be meaningless

**[*33]** if written supervisory approval of an unspecified penalty was sufficient; examining agents would be free to assert any type of penalty after written supervisory approval was given, an action that section 6751(b)(1) was designed to prevent. Consequently, since respondent has not proffered any other evidence that he complied with the procedural requirements of section 6751(b), petitioners are not liable for the section 6662(a) and (h) accuracy-related penalties.

We have considered all of the arguments made by the parties and, to the extent they are not addressed herein, we find them to be moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decision will be entered under</u>

<u>Rule 155</u>.